(81 South. 585)

PILCHER et al. v. SURLES. (4 Div. 756.)

(Supreme Court of Alabama. May 1, 1919.)

1. DEEDS ⬅211(4) — "UNDUE INFLUENCE" — DEGREE OF PROOF.

Undue influence is a species of constructive fraud, and depends upon the circumstances of each particular case, but stronger proof is required to raise a presumption of undue influence in the case of a will than in a deed.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Undue Influence.]

2. DEEDS ⬅211(4)—UNDUE INFLUENCE—EVIDENCE.

In a suit by the grantor, who was a spinster 75 years old, to cancel a deed given to her three sisters, evidence *held* to justify a decree of cancellation on the ground of undue influence.

3. DEEDS ⬅211(4)—UNDUE INFLUENCE—EVIDENCE — IMPROVIDENCE — INADEQUACY OF CONSIDERATION.

In suits to cancel deeds on the ground of undue influence, the improvidence of the transaction and the inadequacy of the consideration are cogent circumstances, when associated with evidence of actual undue influence.

4. DEEDS ⬅211(4)—UNDUE INFLUENCE—SURPRISE.

In a suit by the grantor to cancel a deed given to her three sisters on the ground of undue influence, evidence that the visit of the grantees to the grantor at the time the deed was executed took the grantor by surprise, and that she executed the deed without due deliberation for an inadequate consideration, is sufficient to justify a decree of cancellation.

---

⬅For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

Appeal from Circuit Court, Houston County; H. A. Pearce, Judge.

Suit by M. J. Surles against Lula Pilcher and others, for the cancellation of a deed. From a decree for complainant, respondents appeal. Affirmed.

Complainant, appellee here, filed this bill against her three sisters seeking the cancellation of conveyances of certain real estate executed by her on January 19, 1914, to each of them respectively. The court below rendered a decree granting relief and canceling the deeds, and from this decree respondents prosecute this appeal.

The evidence discloses that complainant, a spinster about 75 years of age, was at the time of the execution of these conveyances living in the town of Madrid, about 14 miles from Dothan, Ala., which town is located on the railroad, and that her sister Mrs. A. A. Varner, about 64 years of age, was then residing with her; that another sister, Mrs. S. L. Varner, about 67 years of age, was residing at Slocumb; and the third sister Mrs. Lula Pilcher, 53 years of age, was residing in Dothan with her husband, W. C. Pilcher. It is further shown, at the time of the taking of the testimony the two sisters Mrs. A. A. Varner and Mrs. S. L. Varner were living at the home of Mrs. Lula Pilcher. Prior to the execution of the deeds in question complainant and her sister Mrs. A. A. Varner were living with their brother, Walter Surles, who died November 23, 1913.

Complainant owned in her own name the house and lot in Dothan deeded to the respondent Mrs. Lula Pilcher, valued at $3,-000, and a half interest in the house and lot at Madrid, valued at about $800; the other half being owned by her brother, Walter Surles.

A few days before his death, the said Walter Surles executed a will, devising practically his entire estate to this complainant, and by which she was given the entire interest in the house and lot at Madrid, just referred to, and also a small farm in Houston county, valued at about $1,000. Complainant had filed petition to have this will admitted to probate, of which due notice had been given; and January 26, 1914, was the day set by the court for hearing said petition. This is all the real estate claimed to be owned by complainant, and in addition thereto she had about $100 in money, together with some personal property of little value.

There was evidence tending to show that she was very fond of her brother, Walter Surles, that she assisted in nursing him during his last illness; that he died of pellagra; and that she at the time of the execution of the deeds in question was suffering from the same disease, but to what extent is not made to appear. There was also evidence offered on complainant's be-half tending to show the effects of pellagra upon the patient, especially upon the nervous system and upon the mind. The medical authority offered in evidence stated, in pellagra there are "marked nervous and general symptoms, insanity, mania, or melancholia being common." The physician who had been treating her since the execution of these deeds testified that she had some of these symptoms. The complainant testified that the respondents knew that she was being treated for pellagra, and that on the day of the execution of the deeds she was in a feeble, nervous condition, and deeply grieved over the death of her brother.

The evidence further shows that on January 19, 1914, complainant's two sisters Mrs. Lula Pilcher and Mrs. S. L. Varner, together with W. C. Pilcher, came to the complainant's home at Madrid and spent the day with her. The two sisters went direct to the house, but W. C. Pilcher, who was interested in a business at Madrid, stopped by the business portion of the town, and did not reach the house until about noon. These three insist that this visit was made for the sole purpose, and with no other intention whatever, of getting the two sisters, complainant and Mrs. A. A. Varner, to move from Madrid and live with Mrs. Lula Pilcher in Dothan, as they (respondents) were fearful of their safety in living alone. Respondents state this subject was discussed after the dinner hour, and that they told complainant they were very uneasy for her safety and that of their sister Mrs. A. A. Varner; that W. C. Pilcher stated he would build two rooms on the house which he then occupied in Dothan, where they could come to do light housekeeping. Complainant demurred, saying she had to look after the farm, and W. C. Pilcher offered to assist her in that respect, and bring her down to Madrid often. Complainant then suggested she would sell her property, but said W. C. Pilcher strongly advised against this, making the suggestion that she keep the property and "deed it to the ones she wanted to have it at her death, and not to sell any more; that the rents and income were ample for her to live on; and it would be much better for her." Mrs. Pilcher, in testifying as to this conversation between her husband and complainant, said:

"She said she would have to sell out her stuff, and he said, 'No; I would not do that; you have lost a heap of money; but let out your property. You will have all the income you will need to support you with from now on until your death, and if you want anybody to have your property, just deed it to them, and there will be no trouble about it.' And she agreed to it." That complainant within half an hour's time acquiesced in this suggestion, and, upon being asked to whom she wished her property to go at her death, stated to her three sisters, who were there with her, and that the deeds could be made.

W. C. Pilcher testified that he told them to get together and divide the property as she wanted it to go, and that he left immediately, was gone about an hour; that during his absence he obtained blank deeds from the bank, and upon returning to the house wrote out the deeds and explained to her (complainant) that she could not afterwards sell the property; that he also told her that she should pay the taxes and keep up the repairs, and that she signed the deeds; and he took them to the bank and had the cashier go out later in the afternoon and take her acknowledgment. Such is the version of the transactions from respondents' standpoint.

The deed to Mrs. Lula Pilcher was in the usual form, with covenants of warranty, and conveyed the house and lot in Dothan in which Mrs. Pilcher and her husband were then living. The deed to Mrs. S. L. Varner conveyed the property at Madrid, and that to Mrs. A. A. Varner the farm, each of the deeds being the same with the exception of the change of name, and each containing a reservation to the grantor of all rents and income arising from the property during her life, and reciting a consideration of "love and affection and one dollar."

Complainant had a sister who married one Gregory, and who died, leaving several children. The children of this deceased sister lived but a short distance from the complainant and she knew them quite well, and there was evidence tending to show they had a place in her affections. Some of these children, particularly two nephews, with whom she is now living, were young men of little means, while the evidence tends to show that the respondents were not in need of financial aid.

The evidence further shows that shortly after the execution of the deeds, either the next day or a few days thereafter, complainant stated to W. C. Pilcher she wanted the deeds returned, and this request was refused, and the deeds were thereupon filed for record.

Complainant's version of what transpired on the day of the execution of the deeds is at variance with that of the testimony of respondents. She states that about 3 o'clock in the afternoon, with her three sisters present, W. C. Pilcher began a conversation in which was introduced the subject of the execution of the deeds; that she stated several times she did not want to make the deeds, and that he persistently insisted; that he stated, if she did not execute the deeds, he would break the will of Walter Surles, which, as previously shown, was to be probated just one week from that date; that the will would be broken, and the property divided among the heirs; that when they told her their intentions, it shocked her, as she had had no previous warning whatever,

and she was weak and nervous. Her testimony further shows that after considerable persuasion and threats, as above indicated, on the part of W. C. Pilcher—the conversation continuing from 3 o'clock in the afternoon until after sundown—she signed the deeds which he had then and there prepared; that respondents with W. C. Pilcher made the division to suit themselves. Complainant states they insisted on the execution of the deeds that afternoon, as they wanted to catch the train and return home; that W. C. Pilcher did the talking, all of which was in the presence of her sisters, the respondents, and complainant had no one to advise or counsel her.

There is no insistence there existed any ground for a contest of the will of Walter Surles.

Complainant further insists that when she asked W. C. Pilcher for the return of the deeds he declined, saying that he had seen lawyers to find out how to get the property, had showed them the deeds, and they had told him that the deeds were as good as could be made. All of this W. C. Pilcher denies. Complainant made a like request of Mrs. Pilcher, who stated:

"It is best like it is; it will support you bountifully; * * * and it will be best for you to keep the property like it is."

Respondents deny that the will of Walter Surles was even mentioned on the occasion of the visit to complainant's home.

The evidence tended to show that Mrs. S. L. Varner, who resided at Slocumb, was invited to W. C. Pilcher's home, where she spent the day just before going to Madrid.

While W. C. Pilcher testified that he went back to the bank in the afternoon to get the blank deeds, yet complainant states that he had the deeds with him; and this is corroborated by one Fields, the cashier of the bank, from whom W. C. Pilcher procured the blank deeds.

After the execution of the deeds no serious efforts seem to have been made to have complainant come to live at the home of W. C. Pilcher, or to build the rooms to the house for her to live in; the respondents giving as an excuse therefor she had stated she wanted the deeds returned. It is shown that after the lapse of several months complainant moved to the home of her nephew Walter Gregory, where she is now residing on a farm owned by Dr. Doty, who married one of Mrs. Gregory's daughters.

The respondents state that complainant was a woman of good business ability and of clear mind, and that she appeared entirely normal on the day the deeds were executed.

The evidence further tends to show that W. C. Pilcher was 52 years of age, and had been engaged in various business enterprises for a period of more than 30 years; that

he is a man of strong mind and of persuasive reasoning power. It is further shown that he had failed for about $30,000, and was then in bankruptcy, and that he owed the complainant the sum of $550, which he had borrowed, according to his own statement, but according to complainant's statement the amount due was approximately $1,800. The amount is placed at something over $500 in the bankruptcy proceeding. Pilcher testified that he had seen the complainant almost daily for 30 years; that for 3 years of the time she had lived in the house with them, and during the balance of his acquaintance she had lived not over 100 yards from his home, until her removal to Madrid a year or two ago. The evidence further tends to show that complainant had stood security for him at the bank several times, and had loaned him money without taking his note therefor, and without charging him interest. The testimony of W. C. Pilcher indicates that he looked after some of her business affairs and made no charge for his services.

It further appears that complainant rents out the property which she has, and that after the payment of the taxes and necessary repairs her net income would scarcely exceed $200 per annum, and that this is entirely insufficient for her support, and in case of sickness she would be entirely dependent upon the charity of others.

The sister Mrs. A. A. Varner, who was living with complainant at the time, was a witness for respondents, but her testimony was of little value, as she claims not to have heard the conversation, being busy with domestic matters.

The will of Walter Surles also gave to complainant an interest in a mercantile establishment at Madrid, in which W. C. Pilcher's son was interested, and this interest, previous to the transactions here involved, she gave to his son, and as to which she seeks no interference.

Mrs. Pilcher testified that complainant, while her brother Walter was dying, and just a few hours before his death, came and whispered to her while she sat fanning him, "I have been in the will—he willed it all to me."

Farmer, Merrill & Farmer, of Dothan, and Sollie & Sollie, of Ozark, for appellants.

H. L. Martin, of Ozark, for appellee.

GARDNER, J. The original bill sought cancellation of the conveyances here in controversy upon the ground of undue influence. Other grounds were added by amendments to the bill, including fraudulent representations; but the conclusion we have reached renders a consideration of these phases unnecessary, and they may therefore be laid out of view.

The bill very clearly is sufficient in its averments for the setting aside of these conveyances upon the ground of undue influence. Alexander v. Gibson, 176 Ala. 258, 57 South. 760. And the case simply presents a question of fact as to whether or not the proof was sufficient to authorize the relief sought upon this ground.

Since the act of 1915 (page 594) it has been the policy of this court not to enter into any analysis or discussion of the evidence in detail. Underwood v. Underwood, 77 South. 233.[1] However, the cause has been very elaborately and ably briefed by counsel for the respective parties, and we have felt it proper to state as briefly as we may the conclusions reached from a careful study of the evidence, no detail of which has escaped our attention. The report of the case will contain a sufficient reference to the tendencies of the evidence for a general outline of the merits of the cause, as thus presented by the proof.

[1] As stated by this court in Shipman v. Furniss, 69 Ala. 555, 44 Am. Rep. 528:

"Undue influence is a species of constructive fraud, and a question depending upon the circumstances of each particular case."

Distinction is also made by the authorities between wills and deeds of gift; stronger proof being required to raise a presumption of undue influence in the case of a will than in a deed.

"Improper influence may be often inferred to have operated in producing gifts, where the same evidence would fail to authorize such an inference in case of a legacy or devise." Authorities supra.

We are impressed that some of the evidence for the respondents displays too great an interest and a willingness to have complainant placed in an unfavorable light before the court. We refer particularly to the statements claimed to have been made by the complainant to some of her sisters in reference to her brother's will, just a few hours previous to his death. We do not find from this record such evidence as would tend to support the theory that complainant was a woman of so grasping a disposition, so lacking in a sense of propriety of the occasion and in real affection for her brother, as to have given utterance (in a whisper) to such expressions as here claimed. But we intend no detailed discussion of the evidence.

Suffice it to say, the evidence has been read and reread, and given most careful consideration; and from a study of this record the following conclusions are reached: Complainant at the time of the execution of the deed, while of sound mind, was suffering with pellagra, and was evidently very nervous, as well as greatly grieved over the death of her brother, with whom she had

been living. She was alone in the world but for these sisters and her nephews.

We are further persuaded that Mrs. S. L. Varner came to the home of W. C. Pilcher at his request, and that the will of Walter Surles was discussed and understood among them, and that these three went on the following day to complainant's home, without previous notice to her, for the purpose of securing the deeds here in controversy. While the question of complainant and her sister moving to the home of W. C. Pilcher was doubtless discussed during the conversation, yet we are rather impressed that this discussion was more as a means to an end, and that this was in no manner the primary object of the visit. We also think that W. C. Pilcher went to the home with the blank deeds already in his possession.

[2] It may be seriously questioned that W. C. Pilcher occupied such a confidential relation with the complainant as, under the decisions, would cast the burden of proof upon the respondents to show that the transactions were fair and just in every respect. But this question we pass without decision, as being unnecessary; for we have reached the conclusion that, regardless of the question of the burden of proof, actual undue influence has been sufficiently established to justify the relief granted in the court below. W. C. Pilcher was a man 52 years of age, with more than 30 years of varied business experience; and it is shown without dispute that he was of a strong mind and persuasive powers. During all this period he had intimately known the complainant. There can be no question but that she had, as shown by her conduct, great confidence in his business integrity as well as his ability. He had attended to some of her business affairs; she had been his security at the bank, and loaned him money without even a note and without interest. She was 75 years of age, a spinster, diseased and nervous, and deeply grieved over the loss of her brother. It is quite clear that his was the dominant mind, and she decidedly the weaker. Respondent's testimony shows that the execution of just such deeds as are shown was first mentioned to complainant by W. C. Pilcher, and sufficient excuse for such suggestion being then made does not here appear. He merely advised her "it would be much better for her." At no time does it appear that she had ever considered, for even a moment, or suggested making such disposition of her property as is here shown; yet, according to the theory of W. C. Pilcher, within half an hour she stripped herself of practically all the property which she owned, reserving only the rents and income during her natural life, with the understanding that she was to pay the taxes and make the repairs.

We think it clearly appears, notwithstanding the denial on the part of the respondents, that the complainant's version of these transactions is correct, and that the will of the brother was discussed and complainant made to entertain fears that the respondents, through W. C. Pilcher, would deprive her of the fruits of his gifts, or prolong litigation in reference thereto. In addition to this, it may be she was influenced by the promise of Pilcher to provide a place for her to live at his residence, then owned by the complainant, and doubtless she had been affected by the expressed fears of her sisters as to her safety in remaining in Madrid; and, further, that W. C. Pilcher, in the presence of her sisters, by the dominance of his will and with his great persuasive powers, led complainant in her feeble and mentally disturbed condition to act hastily, without time or opportunity for deliberation, and without any disinterested advice or opportunity to obtain it, and under the influence of threats of disturbing the brother's will.

[3] In cases of this character, the improvidence of the transaction is a cogent circumstance. Shipman v. Furniss, supra. Likewise the inadequacy of the consideration, when associated with the evidence of actual undue influence, may also be given consideration. Hassell v. Hassell, 201 Ala. 190, 77 South. 716.

That these transactions were most improvident is too clear for discussion. According to the testimony of the respondents, complainant was assured that the income from the property would give her a "bountiful support," yet actual experience has demonstrated its insufficiency for this purpose, and that in case of sickness she would be dependent upon the charity of others.

[4] Complainant was taken wholly by surprise; she had had no intimation of the visit, and in her impaired state of mind and health no doubt was shocked, as she testified, when their purpose was made clear. The following quotation from Holt v. Agnew, 67 Ala. 360, is here pertinent:

"And so in cases of surprise, of sudden action without due deliberation, if there is great inequality of consideration in the transaction, and advantage is taken of the circumstances which mislead, confuse or disturb the reason and judgment, the court will intervene."

It also clearly appears that immediately upon complainant finding herself from under the influence of W. C. Pilcher and her sisters, she recovered, and, realizing what she had done, demanded the return of her deeds.

We are also of the opinion that complainant had a very affectionate regard for her nephews, and, as shown by the testimony of one Reese, witness for the respondents, she had desired that they share in her small estate at her death. They were in

need of assistance, while the sisters were not.

We think it a matter of some significance that the sister Mrs. A. A. Varner, who was living with complainant, could testify to nothing of any value in the cause, although in the house during the entire day; but we forego further discussion.

The facts and surrounding circumstances come with impelling force upon the unbiased judicial mind, producing the conviction that the execution of these deeds was induced by undue influence, as herein shown, and that the transactions should not stand. In view of this conclusion, questions as to other phases of the bill become immaterial, and therefore unnecessary to treat.

The decree of the court below is in accord with the conclusion we have here reached, and is therefore accordingly affirmed.

Affirmed.

ANDERSON, C. J., and McCLELLAN and SAYRE, JJ., concur.