(94 South. 757)

**HARRIS et al. v. BOWLES et al.**
**(8 Div. 393.)**

(Supreme Court of Alabama. Oct. 26, 1922. Rehearing Denied Dec. 7, 1922.)

**1. Courts ⊜104—Not policy of Supreme Court in fact cases to discuss evidence in detail.**

It is not the policy of the Supreme Court, especially since passage of Acts 1915, p. 594, as to opinions, to analyze or discuss the evidence in detail in cases resting for determination on mere issues of fact.

**2. Evidence ⊜63—Sanity is presumed.**

One is presumed sane till the contrary is proved.

**3. Deeds ⊜68(1½)—Measure of sufficiency of mental capacity of grantor stated.**

It is enough that grantor had sufficient mental capacity to fairly understand the nature and consequences of the act; and mere weakness not amounting to incapacity to understand the act is not enough to avoid the deed.

**4. Deeds ⊜17(1)—Release of debt of another valid consideration.**

That consideration of a deed was release of the debt of another, and so in the nature of a gift to such third person by grantor, does not affect validity of the deed.

**5. Deeds ⊜68(5) — Degree of grantor's drunkenness to avoid deed stated.**

To avoid a deed on the ground of intoxication of grantor at the time of its execution, it must be shown that he was then in such a state of drunkenness as not to know what he was doing or the consequences of his act.

**6. Deeds ⊜211(1)—Long acquiescence of grantor evidence of validity.**

Long acquiescence of grantor in a deed, if not amounting to laches, is strongly persuasive of validity of transaction.

**7. Deeds ⊜68(1½)—Grantor's mental incapacity at time of executing deed must be shown.**

To avoid a deed for mental incapacity of grantor, such incapacity at the very time of the transaction must be shown.

**8. Deeds ⊜211(1)—Mental incapacity of grantor held not shown.**

Mental incapacity of grantor at time of executing to her son's widow, with reservation of life estate, a deed of gift of part of the land she had inherited from the son, held not shown in suit by her heirs to avoid the deed.

**9. Deeds ⊜196(3)—No technical confidential relation between mother-in-law and daughter-in-law relative to burden of proof as to undue influence.**

That grantee in a deed of gift was grantor's daughter-in-law did not of itself create one of those technical relations from which trust and confidence are presumed by law to arise, so as to cast on grantee the burden of proof as to undue influence.

**10. Deeds ⊜196(3)—Any burden of proof on grantee as to undue influence held sustained.**

Even if a confidential relation in fact existed between grantor in a deed of gift and her daughter-in-law, the grantee, so as to cast on grantee the burden of proof as to undue influence, held, that such burden was sustained.

**11. Deeds ⊜72(1)—Influence from sympathy and affection not undue influence.**

Influence of grantee which is the result of sympathy and affection is not undue influence that will avoid a deed.

**12. Deeds ⊜72(1)—Influence to be undue must destroy free agency.**

Influence, to be undue, and so avoid a deed, must be such as to destroy free agency and substitute the will of another for that of grantor.

Appeal from Circuit Court, Lawrence County; Robert C. Brickell, Judge.

Bill by James J. Harris against Argie C. Bowles and others to cancel deeds, and cross-bill by R. N. Harris, Jr. From a decree dismissing the original and cross bills, original complainant and cross-complainant appeal. Affirmed.

E. W. Godbey, of Decatur, and Kirk & Rather, of Tuscumbia, for appellants.

The mental defect or disease necessary to entitle one to avoid his contract on the ground of insanity need not be so great as to dethrone his reason, but is sufficient if he is insane to such an extent as to be in-

capable of comprehending or understanding the subject of the contract, its nature, and possible consequences. 22 Cyc. 1206; 131 Ala. 280, 31 South. 603; 97 Ala. 731, 12 South. 72; 104 Ala. 642, 16 South. 689; 81 Ala. 530, 1 South. 217, 60 Am. Rep. 175; 22 Cyc. 1206. In transactions inter vivos, where the parties occupy relations of confidence, the donee has the burden to rebut the presumption raised by law that the gift was the result of undue influence. 157 Ala. 262, 47 South. 584; 2 Words and Phrases, 1423; 136 Ala. 499, 34 South. 836; 69 Ala. 555, 44 Am. Rep. 528; 135 Ala. 302, 33 South. 659. The burden of exculpatory proof is more stringent as against a beneficiary in a deed than in case of a will. 202 Ala. 646, 81 South. 585; 91 Ala. 290, 8 South. 286, 24 Am. St. Rep. 904.

Eyster & Eyster, of Albany, Callahan & Harris, of Decatur, and Charles M. Sherrod, of Moulton, for appellees.

In a suit to cancel a deed for mental incapacity, there is a presumption that the grantor was sane and the deed valid, and the burden to show that he was mentally incapable of consummating the conveyance is on the complainant. 204 Ala. 656, 87 South. 94; 126 Ala. 323, 28 South. 586; 108 Ala. 379, 18 South. 831; 171 Ala. 662, 55 South. 147; 20 Ind. 155, 83 Am. Dec. 314; 4 Cow. (N. Y.) 207, 15 Am. Dec. 354; 44 W. Va. 612, 30 S. E. 201, 67 Am. St. Rep. 788. The influence for which a will or deed will be annulled must be such that the party making it has not free will, but stands in vinculo. 106 Ala. 584, 17 South. 734; 23 Ala. 290; 95 Ala. 579, 10 South. 103; 118 U. S. 127; 6 Sup. Ct. 1001; 30 L. Ed. 112; 129 U. S. 663, 9 Sup. Ct. 420, 32 L. Ed. 747; 135 U. S. 167, 10 Sup. Ct. 705, 34 L. Ed. 84; 94 Ala. 530, 10 South. 129; 95 Ala. 503, 11 South. 125, 36 Am. St. Rep. 235; 97 Ala. 73, 11 South. 901. Although a grantor in a deed is extremely aged, his mind weak and impaired, compared with what it has been, and even if he has no capacity to transact general business, yet, if he understands the nature of what he is doing, and the person to whom he is giving it, and how he desires to dispose of it, at the time he executed the deed, this is sufficient to make it valid. 44 W. Va. 612, 30 S. E. 201, 67 Am. St. Rep. 788; 50 Ill. 79, 99 Am. Dec. 489; 5 Wash. 405, 31 Pac. 1031, 34 Pac. 152, 34 Am. St. Rep. 868; 4 Wash. C. C. 262, Fed. Cas. No. 13,412; 95 Ala. 495, 11 South. 125, 36 Am. St. Rep. 235; 200 Ala. 420, 76 South. 352. Long acquiescence in a transaction is a feature which, if not amounting to and binding on complainant as laches, is strongly presumptive of the validity of the transaction. 135 Ala. 336, 33 South. 480. In order to render a deed invalid on account of the drunkenness of the grantor, it must be shown that at the time of making it the grantor was so drunk that his reason was dethroned. 127 Ala. 557, 29 South. 57, 54 L. R. A. 440.

GARDNER, J. By this proceeding the heirs of Mrs. Mary H. Sherrod, a resident of Lawrence county, Ala., who died in March, 1920, seek the annulment of certain deeds, the first of which was executed by Mrs. Mary H. Sherrod and her son Harris Sherrod in 1908, and the second by Mrs. Sherrod alone on October 15, 1915. The respondent Mrs. Argie C. Bowles was the grantee in each of these conveyances; and, while some of the heirs of Mrs. Sherrod are made parties respondent, yet their interest is antagonistic to that of Mrs. Bowles, and they are respondents in name only. For convenience, therefore, Mrs. Bowles will be referred to as the respondent to this cause.

The issues are presented by original bill as well as cross-bill, but these pleadings seek the same end and present like issues of fact, resting the annulment of these conveyances upon the ground of mental incapacity on the part of the grantor and undue influence. The trial court denied the relief sought, and from the decree dismissing the original and cross bills the complainant and cross-complainant have prosecuted this appeal.

[1] No complicated or novel questions are presented, and cases of this character are to be determined upon their own peculiar facts and circumstances. As there are two transactions involved separated by a period of seven years, in view of the nature of the case, the evidence naturally takes in a wide range, and the record is very voluminous, being submitted to this court in five separate volumes. Anything like a comprehensive and detailed discussion of the evidence is not considered practicable and would extend this opinion to undue length. Indeed, in cases resting for determination upon mere issues of fact it has not been the policy of this court, especially since the passage of the act of 1915, to enter into an analysis or discussion of the evidence in detail (Acts 1915, p. 594; Underwood v. Underwood, 200 Ala. 690, 77 South. 233), nor would it serve any useful purpose in the present case. The parties to this litigation therefore will rest content with a very general observation and statement of our conclusions.

The deed of 1908 was executed on August 15th under the following circumstances: The respondent Mrs. Argie C. Bowles, when about 23 years of age, married Frank E. Sherrod, the oldest son of Mrs. Mary H. Sherrod, he being several years her senior. They lived about one mile from Mrs. Mary H. Sherrod on an adjoining plantation for something like 2½ years, when, on June 27, 1908, Frank Sherrod died without issue leaving surviving his widow, Argie C. Sherrod (now Mrs. Bowles), his mother, Mrs. Mary Sherrod, and his brother, J. Harris Sherrod, as his sole heirs at law. He left an estate consisting of considerable

lands and some personalty. Mrs. Bowles at that time was something over 25 years of age, and entirely unacquainted with business affairs. Remaining a week after her husband's death, she went on a visit to her sister in Nashville, but her brother, who was a business man living in Decatur at the time, undertook to look after her interest in the estate and employed Judge C. M. Sherrod as attorney. She was appointed administratrix. As to the real estate Mrs. Bowles was entitled to dower of one-half interest therein; and negotiations were had between the parties in interest looking to a division of the real estate and a settlement of the question of dower without a resort to the court for that purpose.

We are inclined to the view that a proposal for such a settlement first came from Harris Sherrod, who was a bachelor more than 40 years of age, residing with his mother at the time, and, it seems, looking after her plantation interests in connection with his own. Frank Sherrod at the time of his death was also engaged in the mercantile business, and furnished supplies to the plantation tenants. On the books there was charged to Harris Sherrod about $5,900, and a personal account against Mrs. Mary Sherrod of $21. Hon. James Jackson, an attorney of considerable experience, was employed by Harris Sherrod to represent the interest of himself and his mother in the matter of this estate. The negotiations resulted in a contract reduced to writing and duly signed by the parties in interest and witnessed by disinterested persons wherein it was agreed that three commissioners should be selected for the purpose of making division of the real estate of Frank Sherrod into two equal parts, and a payment on the part of this respondent of a stipulated sum to Mrs. Sherrod and her son Harris for their remainder interest in that portion of the real estate which should fall to this respondent in the division, so that the parties would own the fee-simple title to the separate tracts of land. There was also provision as to arbitration upon the question of rents which were to fall due a short time thereafter.

The commissioners were selected and the real estate by them divided into two equal parts as soon as practicable, but they agreed upon a payment by this respondent of an amount something less than $700 to equalize the division. Judge Sherrod testified that he discussed with Harris Sherrod and his mother the terms of this agreement, all of which were fully understood, and that their attorney, Mr. Jackson, participated in the preparation of some of the paragraphs of the contract. The amount stipulated to be paid by this respondent was paid by her partly in cash, but the greater portion in a release of the indebtedness of $5,900 charged on the books to Harris Sherrod, and $21, the personal account of Mrs. Sherrod. On August 15, 1908, pursuant to this agreement and in consummation thereof, this respondent executed a deed to Mrs. Sherrod and her son Harris, jointly, to that portion of the lands allotted to them by the commissioners, and they in turn executed their deed to her for her portion. This deed is sought to be set aside first on the ground of mental incapacity on the part of Mrs. Sherrod as well as Harris Sherrod.

At the time of the death of Frank Sherrod, Mrs. Sherrod was on a visit at his home, and he fell dead at her feet, by which she was greatly grieved and shocked.

There seems to be some confusion as to her exact age at this time, the testimony of the respondent tending to show she was 74 years of age, while that for complainant that she was 78. Mrs. Brewer, a sister of Mrs. Sherrod, testified, however, that in October, 1915, the latter was 85 years of age, but appeared to be 78.

Mrs. Sherrod lost her husband soon after the Civil War, and was left two sons, whom she reared to manhood and educated. She seems to have managed well her affairs, and was successful in the control of her landed estate. Depending upon the price of cotton, at the time of her death her income varied from $5,000 to $10,000 per year. We are convinced from the proof that she was a woman above the average, and, as natural, her interest centered in her two sons. Frank, the older, she looked upon as her staff upon which she could lean in her old age. Harris was some few years younger, a cripple (but to what extent does not appear), and given to strong drink. At the time of this transaction he was a greatly dissipated man, and evidently caused his mother much grief.

It is the contention of counsel for appellants that Mrs. Sherrod was so overcome by the loss of her favorite son and so shocked by the manner of his death, in connection with the thought of being left to lean upon Harris, who was so dissipated, that she became mentally unbalanced, indulged in the use of morphine, and was incapable of understandingly entering into the contract here sought to be impeached.

[2, 3] Upon the question of mental capacity, in Stanfill v. Johnson, 159 Ala. 546, 49 South. 223, it is said:

"The law presumes every one to be sane until the contrary is proved; and it is unsoundness and incapacity to understand the business transacted, as contradistinguished from mere weakness, which must be proved, in order to avoid a conveyance."

The same language was stated in somewhat varying terms in Frederic v. Wilkins, 182 Ala. 343, 62 South. 518, wherein it was said the law requires nothing more than that the grantor should have sufficient mental capacity to fairly understand the nature and consequences of the act in question.

We have carefully studied the evidence offered by the respective parties upon this question, and we are persuaded that Mrs. Sherrod fully understood the nature and consequences of the deed in question, and that her mental capacity more than measured up to the foregoing rule. She recognized the division of the lands and expressed satisfaction therewith afterwards, and, we think, gave a very good reason for the agreement before it was finally consummated.

[4] Much stress is laid upon the fact that the account which was released was in the name of Harris Sherrod, and therefore his mother received practically no benefit. True, the account upon the books was in the name of Harris Sherrod alone; but we are inclined to the view, as insisted by respondent, that this account really represented that of both Harris and his mother for plantation supplies to the tenants of each, as he was assisting in the management of her affairs at that time, and that the separate account of each could be disclosed by an ascertainment of the amount each tenant was advanced, and that the account was so kept in his name as a matter of convenience only. But, whether so or not, this respondent paid a valuable consideration, and the evidence for the respondent tends to show that it was an adequate sum, and that Mrs. Sherrod was capable of understanding the nature and consequences of the transaction, and wished to consummate the same, although it was in the nature of a gift to her son Harris. This could not affect the validity of the deed if the transaction was free from fraud and undue influence. Hassell v. Hassell, 201 Ala. 190, 77 South. 716.

[5] So far as the execution of the deed by Harris Sherrod is concerned, appellants' counsel insist that his mental incapacity was the result of drunkenness. In Wright v. Waller, 127 Ala. 557, 29 South. 57, 54 L. R. A. 440, this court quoted approvingly the following excerpt from the case of Johns v. Fritchey, 39 Md. 258:

"Where a party seeks to avoid an express contract upon the ground that he was intoxicated at the time he entered into it, it is incumbent on him to produce clear and satisfactory proof that he was at the time in such a state of drunkenness as not to know what he was doing, or the consequences of his own acts."

See, also, Lewis v. Davis, 198 Ala. 81, 73 South. 419.

[6] Much proof has been offered by complainants as to the dissipation of Harris Sherrod and his condition while intoxicated. The overwhelming weight of the testimony, however, is to the effect that, when he was not in this condition, he was a man of good mind and good business judgment. We are further convinced from the evidence that at the time of these transactions he was sober and in a normal condition. He recognized

the division of his property, and soon after the execution of the deed here in question he and his mother executed conveyances, one to the other, thus separating their joint interest in the land, and he subsequently sold off various portions to different parties. He continued to live in that neighborhood, conducting his own affairs until the time of his death in February, 1915, fully recognizing and acquiescing in this transaction. His mother likewise throughout the subsequent years fully acquiesced therein. As said by this court in Frederick v. Hartley, 202 Ala. 43, 79 South. 381:

"Where the grantor has for a long time acquiesced in the transaction without complaint, if not amounting to laches, it is strongly persuasive of the validity of the transaction."

See, also, Adair v. Craig, 135 Ala. 332, 33 South. 902.

Upon the question of undue influence alleged to have been exercised by this respondent over the grantors of this deed, little need be said. Respondent was young and inexperienced in business affairs. While she lived near, yet she lived separate and apart from, Mrs. Sherrod and her son Harris. Her kindness and gentleness to her mother-in-law, whom she called "Mother," had doubtless endeared her very greatly to Mrs. Sherrod, but we find nothing in this record indicating at any time any exercise of undue influence or any act in that direction. Indeed, so far as this respondent is concerned, we are persuaded she knew little about the entire matter and left it solely in charge of her brother. We are persuaded, therefore, that this charge is without substantial support in the evidence. It results that the deed of August 15, 1908, is entirely valid and was properly upheld.

The death of Harris Sherrod in February, 1915, left Mrs. Sherrod alone so far as her immediate family was concerned. While she was at the hospital known as the Benevolent Society at Albany, Ala., something more than 20 miles from her home, which was at Courtland, she executed the deed of October 15, 1915—the second deed here sought to be set aside.

This respondent had married the second time, and had a child (a son), but she still took an interest in Mrs. Sherrod, calling on her frequently, and writing to her occasionally, and making small gifts to her. A careful study of this record has convinced us that these attentions on the part of this respondent to this old lady sprang from no mercenary motive, but from affection and regard mixed with sympathy for one in her lonely condition. Mrs. Sherrod had on numerous occasions expressed her great affection for this respondent, and we think she fully recognized her second marriage as entirely natural for one of her age. All the witnesses agree that the respondent was a source of

much comfort and joy to Mrs. Sherrod; but the evidence fails to disclose any act on the part of Mrs. Bowles indicating an effort to exercise any undue influence or to gain from Mrs. Sherrod any advantage to herself. She received from Mrs. Sherrod no gifts worthy of special mention here, and had with her no business dealings. She never lived with Mrs. Sherrod, nor the latter with her, and their visits to one another were of brief duration.

On the day of the execution of this latter deed to the respondent Mrs. Sherrod also executed a deed to Miss Campbell, who had been her practical nurse for about six years, and who had rendered faithful service. The deed to Miss Campbell was to four vacant lots in the town of Courtland, valued by Mrs. Sherrod's brother, R. N. Harris, Sr., at $750. This was based on a consideration of regard for Miss Campbell and in recognition of her services; and the consideration named in the deed to this respondent was the love and affection which the grantor had for her as the widow of her son Frank. The land conveyed was 400 acres, known as the Ida Allison place, and which adjoined the land of Mrs. Bowles. It was a part of the estate of Frank Sherrod. It was not inherited, but purchased, by him; and Mrs. Sherrod had frequently stated that she wanted to give Mrs. Bowles some property. In one of her early wills—and she made several—she had remembered Mrs. Bowles, but after the execution of this deed she seems to have made two wills, in neither of which Mrs. Bowles is mentioned. Judge Sherrod was her attorney, and drafted for her a number of wills, and also the deeds she executed. While at the hospital in Albany she had Miss Campbell to call Judge Sherrod over the telephone, requesting him to come there, as she wanted to see him about some business. He came in response to her request, and, according to his testimony, she told him what she wanted to do, describing the lands she wished to give this respondent by referring to it as the Ida Allison land, and also the four lots she wished to give to Miss Campbell, and that she wished to reserve a life estate. He left for the purpose of getting information as to the proper description, drew the deeds according to her direction, brought the deeds to her, and left them with her.

The testimony of Miss Campbell and Judge Sherrod strongly tend to establish that Mrs. Sherrod fully understood what she wanted to do and the consequences of her action, and that her mind was entirely sound. According to the testimony of Miss Campbell, Mrs. Sherrod requested that this respondent secure some officer to take the acknowledgment, and on the morning of the execution of the deed Mrs. Bowles carried the notary public to the hospital, and the deeds were executed and duly acknowledged. His testimony also supports the validity of this transaction. Mr. Hubbard, the superintendent of the hospital,

and his wife also were called as witnesses. His testimony likewise tends to establish the fact that Mrs. Sherrod's mind was entirely sound, and that she understood the nature and consequences of the transaction.

The two deeds—the one to Miss Campbell and the other to this respondent—were executed, acknowledged, and delivered at the same time. They were promptly forwarded for record in the probate office of Lawrence county, but, for some reason not accounted for by the evidence, the deed of Miss Campbell seems not to have reached the record until about a year thereafter.

Complainants have produced much proof as to the condition of Mrs. Sherrod from 1908 until the time of her death, and it would seem that no act or word indicating an abnormal condition of mind has escaped their attention. Nor has the evidence thereof been in the least overlooked here. Mrs. Sherrod had lost the sight of one eye, and the vision of the other was very imperfect. She also suffered from deafness, and a conversation with her was more or less difficult. The evidence indicates that on account of this deafness she doubtless talked in a loud tone. As particularly stressing her unsoundness of mind, complainants have offered much proof showing that throughout these years she would often lament the loss of her two sons, and express the hope that she too might die and join them in the other world.

[7] We are persuaded from the entire proof that some of the witnesses have doubtless unintentionally given some exaggeration to these lamentations. It must be remembered, however, in connection with such proof, her condition and her surroundings. Those of her household served her for compensation, none of her relatives lived with her, and, so far as her immediate family was concerned, she was alone in the world. She suffered much from nervous debility, and unquestionably longed for companionship. We are convinced, however, that, notwithstanding this condition, she took, considering her age and infirmities, a rather lively interest in present day affairs. A reading of this record is rather persuasive that she merely expressed her innermost feelings when she stated that she too wanted to go. Nor have we overlooked the evidence offered by complainants to the effect that she used expressions a few times indicating that she contemplated self-destruction. We do not think, however, that the proof shows a serious effort in this direction, but that, on the contrary, an appeal by her to her Christian faith and fortitude sufficed as a restraint. It has been held that, while suicide is an act contrary to reason, education, and natural instincts, and may be considered in connection with other evidence to establish insanity, yet that it does not itself establish that fact or create a presumption thereof. Jones v. Gorham, 90 Ky.

622, 14 S. W. 599, 10 L. R. A. 223, 29 Am. St. Rep. 423. We are of the opinion that the evidence offered by complainants as to the declarations and condition of Mrs. Sherrod during all this period is attributable to her extreme nervous condition, and was doubtless done and said in a moment of depression, and when she recovered therefrom was entirely normal, so far as soundness of mind is involved. Indeed, her brother R. N. Harris, a party to this suit, and whose interest is opposed to that of this respondent, testified that he [to use the language of the witness] "did not mean to convey the idea my sister was crazy; at times she was beside herself; at other times she was not." Mr. Harris, as her brother, attended to her business affairs after the death of her son Harris. He was a man of considerable means, and we think the fact that he accepted from his sister a deed to the house and lot in Courtland in 1918, and in the same year accepted from her a gift of $1,800, which was due to her by him as administrator of the estate of her son Harris, tended strongly to demonstrate that he was of the opinion she was entirely of sound mind. Mrs. Ramsey testified that Mr. Harris on one occasion stated to her, in substance, that Mrs. Sherrod was a remarkable woman for one of her age, which statement he did not deny, but said he could not recall. It may be, and doubtless is, true that at times, due to nervous depression, Mrs. Sherrod may have for a short period been beside herself somewhat, as testified by Mr. Harris; but we are persuaded that she soon recovered from this depressing influence, and would become entirely calm. There is no evidence in this case tending in the least to show any such depressing period at the time of the transactions here in question; but all the witnesses who testified and were present at the time of these transactions sustain the view that she was entirely calm and normal. In this connection it must be remembered that the burden is upon complainants to establish mental incapacity at the very time of the transaction in question. Johnston v. Fondren, 204 Ala. 656, 87 South. 94; Pike v. Pike, 104 Ala. 642, 16 South. 689; Delaplain v. Grubb, 44 W. Va. 612, 30 S. E. 201, 67 Am. St. Rep. 788. Miss Gibson, an important witness for the complainants, wrote a letter to Miss Lucile Banks as late as August, 1918, in which she stated, referring to Mrs. Sherrod, "I consider her mind all right; she won't control herself." And, speaking of those days when Mrs. Sherrod attended to her own affairs and was rearing her boys, Miss Gibson said, "Cousin Mary in those days was not an ordinary woman; I doubt whether there was a woman in this town that had her brains for business."

The evidence of several medical experts was also produced, and the doctors disagree, but we think the weight of the expert testimony, especially those in better position to observe Mrs. Sherrod, sustain the contention that she was of sound mind, and we are also of the opinion that the weight of the testimony of disinterested witnesses is to like effect. Nor do we consider that Mrs. Sherrod was a morphine addict in the accepted meaning of that term. We are persuaded the morphine she was given was in small doses and given at such intervals as to act as a sedative, a calming effect upon her nervous condition, and that its administration was not such as to materially affect her soundness of mind. This view is particularly sustained by the evidence of Dr. Petty, who attended her while she was at the Benevolent Hospital in Albany, and also Dr. McAdory, in charge of a hospital in Birmingham, where he observed Mrs. Sherrod as late as 1920. Dr. McAdory was entirely removed from local influence, and is without bias in this case. He was firmly of the opinion Mrs. Sherrod's mind was entirely sound and she was in no sense of the word a morphine addict. He found her particularly careful in regard to financial affairs, talked with her often, and considered her mentally normal for one of her age, particularly.

In the execution of the will of November 22, 1919, the evidence of Judge Sherrod discloses great care on her part that the will be drawn in accordance with her direction, and he was required to rewrite it with material changes under her instruction.

Subsequent to the execution of this deed Mrs. Sherrod expressed satisfaction therewith, and told Mrs. Rainey, with whom she lived for nearly a year after leaving the hospital, that she thought she had done the right thing. The evidence as to the valuation of the 400 acres varies from $10 to $20 per acre.; that of the brother of Mrs. Sherrod fixing the valuation at the latter sum.

When it is considered that this land belonged to the husband of this respondent, and that it constituted only a part of the real estate the mother had inherited from him, and the great affection Mrs. Sherrod had for the respondent, in connection with the fact that those who would inherit from her did not appear to occupy a very close place in her affection, this deed of gift was not at all an unnatural one. It is very plain that Mrs. Sherrod felt that many of her relatives were more or less neglectful, and did not bestow upon her that amount of sympathy and love for which she so greatly yearned; and there is proof in the record strongly tending to show that her feelings in this regard were not without foundation.

It very clearly appears, however, that she thought much of her brother, R. N. Harris, Sr., who was quite attentive, particularly after the death of her son Harris, and that she also thought rather highly of her nephew Tom Harris, who seemed to be more attentive than the others. We have previously referred to her high regard for Miss Camp-

bell, her practical nurse, and this respondent. Between the years 1915 and 1918 she executed deeds of gift to these four persons to real estate, and in each of them reserved a life interest. These deeds left her with considerable estate to be disposed of by will, and in this will, executed in 1919, after making certain bequests and remembering her brother, R. N. Harris, therein, she directed that the remainder of her estate be sold and divided among her heirs at law.

[8] A careful study of the 'record has convinced us therefore that the disposition that Mrs. Sherrod made of her estate was not at all unnatural, but rather the contrary in the light of the facts and circumstances here disclosed. However, we deem further reference to the testimony upon the question of mental incapacity unnecessary, for it is too voluminous for even a brief discussion. We are of the opinion that Mrs. Sherrod's mental capacity fully meets the requirements of the rule previously stated.

[9-12] The only remaining question relates to that of undue influence alleged to have been exercised by this respondent in conjunction doubtless with that of Miss Campbell, the practical nurse, and to this we give brief consideration. The determination of this question is not free from difficulties.

We have previously referred to the great affection Mrs. Sherrod held for this respondent, and this very high regard serves as a foundation for the insistence on the part of complainants that there existed such confidential relation between these two as, under the circumstances here disclosed, cast the burden of proof upon this respondent to show that the execution of this deed of gift was not the result of undue influence, and we are cited to those cases holding that this rule is not confined to merely technical relations, but is applied to all cases in which confidence is reposed by one party in another, and to those informal relations whenever one man trusts in and relies upon another. Cannon v. Gilmer, 135 Ala. 302, 33 South. 659; Coghill v. Kennedy, 119 Ala. 641, 24 South. 459; Bancroft v. Otis, 91 Ala. 290, 8 South. 286, 24 Am. St. Rep. 904.

While Mrs. Sherrod had very great affection for Mrs. Bowles, there is nothing in the record indicating that she ever conferred with her in regard to any business matter of any importance, or discussed with her the disposition of any of her property or the management thereof. They never lived under the same roof, nor had Mrs. Bowles attended to any of her (Mrs. Sherrod's) affairs. The fact she was her daughter-in-law did not create one of those technical relations from which trust and confidence are presumed by law to arise (Nelson v. Brown, 164 Ala. 397, 51 South. 360, 137 Am. St. Rep. 61, 13 Encyc. of Ev. 314), and it may be seriously questioned that the facts in this case established such confidential relation between Mrs. Sher-

rod and this respondent as to bring this case within the foregoing rule (Pilcher v. Surles, 202 Ala. 643, 81 South. 585). This question, however, it is unnecessary to determine, for, without regard to the question of the burden of proof, we have reached the conclusion that the execution of this deed was the result of the uncoerced will of Mrs. Sherrod. It is not influence, it must be remembered, but undue influence, that is charged and necessary to be proven to overthrow this transaction, and such influence as is the result of sympathy and affection only is not undue influence condemned by the law.

In the recent case of Stroup v. Austin, 180 Ala. 240, 60 South. 879, is set out the following, often quoted in our decisions:

"The influence which suffices for the avoidance of a conveyance cannot proceed alone from sympathy or affection for the grantee, but is such as dominates the grantor's will and coerces it to serve the will of another in the act of conveying."

We take from the same authority the following excerpt here pertinent:

"Courts of equity will be astute to discover the signs of fraud, imposition, and unfair dealing, and eager to thwart their evil ends. But in doing so they must be extremely careful not to interfere with that right of free disposal which inheres in the ownership of property, and not to defeat the uncoerced wishes of its owner."

And in Bulger v. Ross, 98 Ala. 267, 12 South. 803, is the following:

"The undue influence which will overturn or defeat a testamentary disposition of property must be of such a character as to overpower the will of the testator, and substitute another's will in its place. It must amount to controlling, mental restraint and coercion, destroying the free agency of the testator. In fact, to constitute such undue influence, the will and wish of the testator must be subordinated and displaced by the superior, dominating will of another. Affection, or a desire to gratify another's wishes, is not that sort of coercion which defeats attempted testamentary disposition. All the better instincts and emotions are left in full play, and are harmless, unless the will itself—the power of independent action—is overcome. It ceases to be the will of the ostensible testator only when it is shown to have been brought about by another's superior will."

As said in Delaplain v. Grubb, supra:

"Both as to deeds and will 'the underlying idea is that the influence must be such as to destroy free agency, and substitute the will of another for that of the person nominally acting.' "

This same authority points out that the mere suggestion and advice addressed to the understanding and judgment do not constitute undue influence, nor does solicitation unless the testator be worn out with importunities so that his will gives way. See, also,

Gilbert v. Gilbert, 22 Ala. 529, 58 Am. Dec. 268.

We are asked to give great significance to the fact that this respondent and her husband carried Mrs. Sherrod in their automobile from her home in Courtland to the hospital at Albany, the city in which the respondent resided; and the insistence seems to be that this was done with a sinister motive, and for the purpose of procuring the execution of this deed. The evidence for the respondent offered rather reasonable explanation, and in connection with this it is shown that at that time Mrs. Sherrod had in contemplation going to a hospital, and was then on the waiting list at such an institution in Florence. She evidently knew that the hospital at Albany was in course of construction, and, learning of its completion, went with this respondent to see if she could find accomodations there. It is also without dispute that she entered this hospital with the knowledge and consent of R. N. Harris, her brother. The deed was executed some two or three weeks from her entrance there. The fact that this respondent carried the notary public to the hospital for the purpose of taking the acknowledgment is shown by Miss Campbell to have been at the special request of Mrs. Sherrod. We are not convinced from this proof that Miss Campbell and this respondent had entered into any conspiracy for this purpose, or were working in conjunction with each other for the purpose of obtaining the two deeds that day executed. There is nothing in this record to impeach the character of Miss Campbell, and it is difficult to conceive that she would enter into any such conspiracy and testify falsely for the small benefit she obtained in the four vacant lots in Courtland. There was nothing unnatural in Mrs. Sherrod sending for Judge Sherrod to draft these instruments. He had drawn for her several deeds and wills, and seems to have been her legal adviser as to these matters, and the distance was not great. The evidence tends to show that he came only as attorney for Mrs. Sherrod, and also strongly supports the theory that Mrs. Sherrod knew exactly what she wanted to do, and that her action was free from undue influence.

We have not overlooked the statement by Judge Sherrod as to the gift of this respondent to him of $10, which he considered, not as a fee, but as a payment of his expenses incurred in these trips in getting up the description and returning with the deed. Respondent knew he was going, and was fully aware of Mrs. Sherrod's intention. She was, of course, greatly interested, and no doubt felt grateful. We have not undervalued any of the unfavorable circumstances brought to light by the evidence in this case, but, as said by the Supreme Court of the United States in Beyer v. Le Fevre, 186 U. S. 114, 22 Sup. Ct. 765, 46 L. Ed. 1080:

"The will of a person found to be possessed of sound mind and memory is not to be set aside on evidence tending to show only a possibility or suspicion of undue influence."

As pointed out in the quotation previously found in this opinion, courts should be extremely careful not to interfere with that right of free disposal which inheres in the ownership of property.

We have found therefore these circumstances insufficient to overcome the evidence contained in this record going to show that Mrs. Sherrod was entirely of sound mind at the time of this conveyance, and that it was the result of her uncoerced will. She had often expressed a desire to give Mrs. Bowles some of her property, and subsequent to the execution of this deed expressed entire satisfaction therewith. The deed was promptly placed upon the record, and it is very reasonable to suppose that its execution was known and understood by her relatives, especially those living in the vicinity. She did not die until five years thereafter, and during this intervening time acquiesced in this transaction, which, as above shown, is strong proof to support its validity.

The entire record has been read with painstaking care, studied and considered in the light of the able and elaborate brief of counsel for the respective parties, and fully mindful of our responsibility as well as the importance of the decision to the parties to the cause. We have referred in a most general way to some of the salient features of the case, but with no purpose whatever to give anything like a detailed consideration of the evidence in this opinion. As a result of our labors we have reached the conclusion that the transactions here sought to be impeached were entirely valid and will be upheld.

The decree of the court below will accordingly be here affirmed.

Affirmed.

ANDERSON, C. J., and SAYRE and MILLER, JJ., concur.