194 So. 827

**McREE v. RUSSELL et al.**

**8 Div. 915.**

Supreme Court of Alabama.

March 7, 1940.

Rehearing Denied April 4, 1940.

344

Wert & Hutson and S. A. Lynne, all of Decatur, for appellants.

Harris & Harris and Chas. H. Eyster, all of Decatur, for appellee Lucile Russell.

GARDNER, Justice.

Dr. James T. Russell was a practicing physician, residing at Woodland Mills in the eastern section of Morgan County, Alabama, where he enjoyed a large and lucrative rural practice. He was held in high regard as a physician of ability by the members of his profession with whom he came in contact. It is quite evident he was a man of fine Christian character, positive in business matters and of "firm will." He accumulated a small estate, and educated those of his children (seven in number) who would accept the advantages: two of his sons (Olney and Howard) being now well launched in their profession as physicians, one at Birmingham and the other in New Orleans, and in whose success he took just pride. His son William has for sometime been an inmate of Bryce Hospital in Tuscaloosa. His daughter Lurline, in whose name this suit was instituted, married McRee of Decatur. Tom and Hammond remained longer at the family home, and are either farming or engaged in some business.

When three or four years of age the daughter Lucile, now thirty-seven years of age and single, sustained an injury in which the hip bone was broken. She is a cripple, using crutches, and does not remember walking. She has been for several years employed as a teacher, much of the time in Decatur, several miles distant from Woodland Mills.

In March 1936, Dr. Russell died, leaving a will executed in April 1933, which was unsuccessfully contested by Lurline McRee on the grounds of mental incapacity and undue influence. McRee v. Russell, 236 Ala. 506, 183 So. 399.

In July 1929, Dr. Russell, then fifty-eight years of age, and in good health, procured two insurance policies in the Protective Life Insurance Company, one for $5,000 and the other in the sum of $10,000. The named beneficiaries were his seven children, share and share alike; but each policy reserved to the insured the right to change the beneficiary. It is the exercise of this right which forms the basis of this litigation. On April 23, 1932, he executed a request for a change of beneficiary in the $5,000 policy, naming his daughter Lucile as sole beneficiary. The request was executed in duplicate, with both copies forwarded to the insurance company, one of which the company attached to the policy and returned to Dr. Russell and the other was retained in the files. It was witnessed by P. W. Williams, agency director for the Protective Life Insurance Company in north Alabama, and who had been with that company for a long number of years. On November 26, 1932, a like request was executed for the $10,000 policy, which was witnessed by Kelly, a lawyer, and Houston, a druggist at Hartselle, Alabama.

This bill was filed by Lurline McRee, attacking these changes, the other children being made parties defendant, including of course Lucile. The Protective Life Insurance Company was also made party defendant, interpleaded, paid the money into court, and was discharged. There was much pleading, but the issues were plain and uncomplicated in any manner.

For convenience, we think it well enough, in referring to the children, other than Lucile and the unfortunate William, to call them complainants, though lacking in strict accuracy.

In the latter part of 1929, or the early part of 1930, Dr. Russell was ill with influenza, and thereafter was not as strong as previously. Complainants insist that as early as 1930 a tremor of his right hand became noticeable to some extent, which increased with time. This was a symptom of what is known as Parkinson's disease. A sedative, known as hyoscine, was prescribed and used to steady his nerves and arrest the tremor of his hands.

■ There are two grounds of assault on the requests for changes in the beneficiary in these policies which are common to both—mental incapacity and undue influence on the part of the daughter Lucile.

Upon this latter ground (undue influence), it may be observed, that though the authorities appear to be rather sharply divided (45 Corpus Juris 198; 105 A.L.R. 957), yet this Court is committed to the view that the beneficiary in cases of this character cannot attack a change of beneficiary by the insured upon the ground of fraud or undue influence, upon the theory that such beneficiary has an interest that is a mere expectancy which cannot become vested until fixed by the death of the insured. Barnett v. Boyd, 224 Ala. 309, 140 So. 375; Taylor v. Southern Bank & Trust Co., 227 Ala. 565, 151 So. 357; Slaughter v. Grand Lodge, 192 Ala. 301, 68 So. 367; Summers v. Summers, 218 Ala. 420, 118 So. 912; Metropolitan Life Ins. Co. v. Bramlett, 224 Ala. 473, 140 So. 752.

Under these authorities, therefore, the matter of undue influence is laid out of view, and the authorities cited by appellant (among them Vol. 2, Black on Rescissions, section 248; Bennett v. Bennett, 65 Neb. 432, 91 N.W. 409, 96 N.W. 994; Meyer v. Fishburn, 65 Neb. 626, 91 N.W. 534, and Holland v. Barnes, 53 Ala. 83, 25 Am.Rep. 595) must be held as here inapt.

■ It is, however, the generally accepted rule that if at the time he attempted to change the beneficiary, the insured was mentally incompetent, such attempted change is ineffective (105 A.L.R. 951), and the original beneficiary has such a substantial interest as would justify an action to prevent or annul such a change. Barnett v. Boyd, supra; Metropolitan Life Ins. Co. v. Bramlett, supra.

■ The issue of fact, therefore, common to both requests for change of beneficiary, is that of mental capacity on the part of the insured, Dr. Russell, to execute them. Upon that issue much testimony was taken, and as a result a rather voluminous record, consisting of six separate volumes, is here presented. The evidence has been read with much care with no detail escaping notice, and it has been considered in connection with the books of account kept by Dr. Russell, here for our inspection. Anything like a comprehensive and detail discussion of this evidence is not considered practicable, and would extend this opinion to undue length. Indeed, in cases resting upon mere issues of fact for determination, it has been the policy of this Court, especially since the passage of the

Act of 1915, not to enter into an analysis or discussion of the evidence in detail (Acts 1915, page 594; section 10336, Michie's Code; Harris v. Bowles, 208 Ala. 545, 94 So. 757; Williams v. Ellington, 233 Ala. 638, 172 So. 903), nor would it serve any useful purpose here. The parties to this litigation, therefore, must rest content with a very general observation and statement of our conclusion.

Perhaps the strongest proof to establish mental incapacity of Dr. Russell comes from his two sons, who are physicians. They insist that Parkinson's disease is a disease of the brain, which weakens and dulls the intellect, such condition being accentuated by the use of hyoscine; and that Dr. Russell during all of 1932 was of unsound mind and incapable of transacting any business. The other three children, Tom, Hammond and Lurline, add their evidence in full corroboration of their father's unsoundness of mind.

All of this proof must of course be weighed in the light of the interest of these witnesses in the outcome of the case, and in the light of the intensity of feeling among them against their sister Lucile, whose actions to them, it is apparent, appear selfish and indeed dishonorable.

Their testimony is also corroborated by Dr. Russell's employee Overstreet, who drove his car, and by some acquaintances and patients of the doctor, some of whom, however, on cross-examination, admit having subsequently called him to their home to attend their sick.

But the proof to the contrary is abundant, and to our minds all persuasive. The four disinterested physicians who were well acquainted with Dr. Russell all testify to his mental soundness, to his continued practice through the years 1931, 1932, 1933 and 1934, and the doctor's books of account add their corroboration to this proof. Some of these physicians contradict any statement that Parkinson's disease affects the mind, but insist it affects only the motor control, and at times renders articulation difficult. Dr. Bragg so states, and strongly sustains Dr. Russell's mental soundness. Dr. Chenault was to the same effect, and both agree that hyoscine taken as Dr. Russell took it did not affect the mind. Dr. White, who was frequently in company with Dr. Russell, both in consultation and in social intercourse during the years 1931, 1932 and 1933, considered him perfectly sound of mind and one of the best practitioners in the county. Dr. Brindley knew Dr. Russell well all of his life and his mind was sound. He agreed with the others as to Parkinson's disease and the use of hyoscine.

Dr. Russell continued on with his practice as attested not only by many witnesses, but by the books themselves. Indeed, complainants could not very well deny the fact that he continued to practice through the years 1931, 1932, 1933 and 1934; but some effort appears to have been made to show that Lucile, who frequently accompanied him on visits, really did the work. We have no doubt she assisted with the medicines as well as with the keeping of his books. He was evidently handicapped by the tremor of his right hand. But Lucile had no knowledge of medicine or the art of healing, and it is clear enough that Dr. Russell's was the guiding mind always as to his practice. Several of his patients testify as to his efficient treatment long after the dates of these requested changes. Dr. Hogeboom, who had studied medicine and practiced a short while many years ago, had known Dr. Russell for thirty years, and in October 1932 was treated by him successfully for a serious heart trouble. He considered him intelligent, well informed and of sound mind. He saw Dr. Russell again in 1934, and his mind was sound. The county health officer considered Dr. Russell of sound mind, as did his banker, his pastor and many of his patients. Dr. Russell had been medical examiner for the Protective Life Insurance Company for many years, and so continued through these years, and the agency director for north Alabama, P. W. Williams, who witnessed the request for change of beneficiary in the $5,000 policy, considered him of entirely sound mind. The superintendent of the hospital states he brought patients there during 1932 and 1933, and was entirely normal so far as concerned his mentality. Lawyer Kelly and the druggest, Houston, who witnessed the request executed on the $10,000 policy in November 1932, considered him entirely sound of mind.

All of these witnesses were wholly disinterested, and as to some of them it is clear enough they would have preferred not being called into this family litigation.

The surrounding facts add weight to this conclusion. The two requests here in

question do not stand alone. As a capable physician, he evidently discerned his failing physical condition, and made plans accordingly. We have referred to his will in 1933, in which he gave reasons, which appear to be entirely sound, for giving some of his children less than others. We need not recount them here.

On the same day he executed the request for a change as to the $5,000 policy (April 23, 1932), he had Williams, the agent who witnessed the request, to write as to a change in the Prudential Insurance Company policy. It was for $1,000, and changed from the wife to the five children, excluding the two doctors. And on November 26, 1932, the date of the request for change in the $10,000 policy, there was also request for change of a $1,000 policy in the Pacific Mutual Insurance Company from his wife to the same five children. And in that same year, 1932, a $5,000 policy in Travelers Insurance Company was so changed that the wife would be paid $50 monthly, which is now being paid her. All of which, together with the execution of his will in April 1933, disclose a general plan as to the disposition of his estate, and some of these complainants received the benefit of the changes then made in their behalf.

Williams, the agent of the company for which Dr. Russell was medical examiner for a number of years, including 1932, 1933 and 1934, tells of Dr. Russell coming by his office in Hartselle seeking information in regard to these changes, and how later on, April 23, 1932, he brought the policy and executed the request for change in his presence, which he witnessed and forwarded to the company; that he stated his daughter Lucile was crippled, and the time might come when she was not able to work; that he had spent much money in the education of his two doctor sons, and had given her little, so he thought he should make the change. To Dr. Bragg he expressed the opinion he would not live much longer, and was solicitous concerning Lucile's future. To Dr. Brindley, when the two were on a trip together to Birmingham, he spoke of Lucile, how he could always count on her, and in view of her crippled condition that he should do more for her.

Lucile had proved most helpful, rendering intelligent service. The tremor in his right hand increased, and he needed assistance which she supplied. He conducted farming operations, and there were mortgages to be satisfied, checks to be signed, and the power of attorney to her is well explained. But we forego further discussion.

We have given careful thought and due weight to the proof offered by complainants, but we conclude the evidence in reply is overwhelming and persuasive to the effect that Dr. Russell was of sound mind when these requests were executed, that he fully understood what he wanted to do, and executed them with full knowledge of their effect.

The request for change as to the $5,000 policy on April 23, 1932, is further attacked upon the ground Dr. Russell's name thereto was forged, and complainants testify that in their opinion the signature is not in their father's handwriting. Corroborative is the handwriting expert from Birmingham who made comparisons, and gave reasons for his conclusion that it was a forgery. These comparisons are here for our inspection. Against this opinion evidence is the testimony of P. W. Williams, long the agent of the Protective Life Insurance Company, and a man whose character is in no manner sought to be impeached. He is wholly without interest, and states clearly and emphatically all that occurred and the previous conversation with Dr. Russell concerning the change, and that it was executed there in his office, witnessed by him and forwarded to the company. The expert's testimony points to Lucile as the forger; but admits a person writes somewhat differently every time he signs his name, and if a tremor in the hand was worse on some day than others, this too would make a difference. If Williams is to be believed, Dr. Russell went alone each time to his office, and Lucile was not present. If Williams signed as a witness to this request, knowing the signature of Dr. Russell was a forgery, he himself would be guilty of like offense. Shelton v. State, 143 Ala. 98, 39 So. 377.

Complainants' theory upon this phase of the case would, upon their opinion evidence only, brand Williams as a perjurer and forger. And yet this record contains nothing which in the slightest degree reflects upon his character as an honest and truthful man.

But without further discussion, we state our clear conclusion that the charge of forgery is not sustained, and that this re-

quest was executed by Dr. Russell just as Williams testified.

Upon due consideration, therefore, we have reached the conclusion that the decree of the chancellor is correct, and is due to be here affirmed. It is so ordered.

Affirmed.

THOMAS, BOULDIN, and FOSTER, JJ., concur.