32 So.2d 32

**TIPTON et al. v. TIPTON.**
**4 Div. 416.**

Supreme Court of Alabama.
July 31, 1947.

Rehearing Denied Oct. 16, 1947.

Murphy & Cook and E. O. Baldwin, all of Andalusia, for appellants.

538

Ralph A. Clark, of Andalusia, for appellee.

LAWSON, Justice.

This is an appeal from a final decree of the circuit court of Covington County, in equity, wherein that court refused to cancel a deed.

J. J. Tipton, late a citizen of Covington County, died intestate in that county on or about July 31, 1944, when nearly 81 years of age. He left surviving him his second wife, Mrs. Naomi Tipton, and four sons and a daughter by his first wife. A daughter of a deceased daughter also survived.

On April 13, 1944, approximately three and a half months prior to his death, J. J. Tipton and wife, Naomi, executed a deed to his son, G. V. Tipton, conveying to the later approximately 107 acres of land for a "consideration of One and no/100 Dollars, and love and affection." The deed contained the following reservation: "It is agreed and understood by and between the parties to this conveyance that the grantors herein reserve a life interest in the lands herein conveyed and they reserve the possession and control over same as long as they live and upon the death of both grantors herein title and possession shall pass absolutely to the grantee."

As before indicated, the purpose of the instant proceeding is to have the said deed of April 13, 1944, declared null and void and cancelled. All of the survivors of said J. J. Tipton appear to be parties to the suit except the widow, Naomi, who, under the amended pleadings, does not appear to be a party. Since the execution of the deed she has conveyed all her interest therein to G. V. Tipton. The complainants in the amended bill are three of the surviving sons, J. W. (Walter), W. A. (Albert), and J. E. (Emmett) Tipton, the surviving daughter, Mrs. Lillie Blackwell, and the granddaughter, Mrs. Helen Scott. The grantee in the said deed, G. V. (Victor) Tipton, the other surviving son, is the, respondent under the amended bill. The sons will sometimes hereinafter be referred to by the name set out above in parentheses after their initials.

The grounds for cancellation of the deed as set up in the amended bill are (1) undue influence and (2) mental incapacity. As to

undue influence, it is alleged in substance that on and prior to April 13, 1944, the day on which the said deed was executed, J. J. Tipton was in poor, feeble, and constantly declining health, and was confined to his bed most of the time; that he was a very old man, weak mentally as well as physically; that a confidential relationship existed between respondent, G. V. Tipton, and his father, J. J. Tipton; that because of his age and physical and mental weakness, the said J. J. Tipton was under the influence and dominion of the respondent, G. V. Tipton, in whom the said J. J. Tipton reposed confidence and trust; that the said deed was executed as a result of undue influence exerted by the respondent, G. V. Tipton, on his father, the said J. J. Tipton. As to mental incapacity, the amended bill in substance alleges that J. J. Tipton was a very old man and that on and prior to the day the said deed was executed the said J. J. Tipton was of unsound mind and his mental condition was such that he was entirely incapable of understanding the purport and effect of such deed, and was incapable of transacting any business of the nature of such deed; that respondent, G. V. Tipton, was fully aware of the mental and physical incapacity of the said J. J. Tipton.

The sufficiency of the amended bill was not challenged by demurrer. Respondent G. V. Tipton answered, admitting the execution of the deed and that his father was an elderly man at the time of its execution. However he specifically denied all material averments as to undue influence or mental incapacity.

Submission was had upon testimony taken orally before a commissioner and not before the court rendering the decree. When causes are thus tried in the lower court, it is the duty of this court to sit in judgment upon the evidence. Cochran v. Cochran, 247 Ala. 588, 25 So.2d 693; Floyd v. Green, 238 Ala. 42, 188 So. 867.

The question of undue influence depends upon the facts and circumstances of each particular case. Floyd v. Green, supra; Barkley v. Boyd et al., 211 Ala. 50, 99 So. 196. It is a species of constructive fraud, difficult of proof, with much latitude allowed in the testimony. Barkley v. Boyd et al., supra; Pilcher et al. v. Surles, 202 Ala. 643, 81 So. 585; Shipman v. Furniss, 69 Ala. 555, 44 Am.Rep. 528.

In cases such as this where a court of equity is called upon to cancel a deed on the ground of undue influence alleged to have been exerted by the grantee over the grantor, the rule is well established that "where confidential relations exist, the burden of proving that the transaction was fair, free from undue influence, fraud or deceit or misrepresentations, and in the case of deeds the grantor, had disinterested, independent and competent advise, is cast upon the beneficiary in such confidential relation." Floyd v. Green, supra [238 Ala. 42, 188 So. 871]. To like effect are the following decisions of this court: Worsham v. Johnson, 231 Ala. 265, 164 So. 381; Verner v. Mosely, 221 Ala. 36, 127 So. 527; Dowe v. Farley, 206 Ala. 421, 90 So. 291; Gibbons et al. v. Gibbons, 205 Ala. 636, 88 So. 833.

The relationship of parent and child is confidential. Worsham v. Johnson, supra; Gibbons et al. v. Gibbons, supra. But our cases recognize that gifts and bequests flow naturally from parent to child in accordance with the instincts and common practice of mankind, Therefore, while the relation of parent and child is per se confidential, yet the presumption prevails in this state that the parent is the dominant spirit, and in the absence of evidence other than the mere voluntary gift and confidential relationship, the presumption is that the transaction was free from undue influence. Worsham v. Johnson, supra; Dolberry v. Dolberry, 153 Ala. 434, 44 So. 1018; McLeod v. McLeod, 145 Ala. 269, 40 So. 414, 117 Am.St.Rep. 41.

However such presumption is not conclusive. The rule in this regard is stated in Dowe v. Farley et al., supra [206 Ala. 421, 90 So. 292], as follows: "Where it is made to appear by the proof that the child, and not the parent, is the dominant spirit, then the burden of proof is shifted to the former to establish the fairness of the transaction, and that it was not the result of undue influence." See Keeble v. Underwood, 193 Ala. 582, 69 So. 473, 475; Couch et al. v. Couch et al., 148 Ala. 332, 42 So. 624.

We are clear to the conclusion from the evidence presented in the record before us that the son Victor Tipton, the respondent in this cause, was the dominant spirit. The father was over 80 years of age, deaf, and feeble both in body and mind. The son Victor was about 50 years of age, apparently in good health. He lived close to his father and operated a portion of the latter's farm. The evidence shows that the son Victor handled financial matters for the father and exerted considerable influence over him. The weight of the evidence is unquestionably to the effect that time and circumstances reversed the order of nature and that dominion of the parent finally became subservience to the child.

█ The confidential relation existing and the grantee, Victor Tipton, being the dominant spirit, the burden was upon him to show the transaction was fair, just, and equitable in every respect.

It only remains to apply the law to the facts presented upon this record. A reference to the evidence in a general way will suffice.

The farm land here involved was the homestead of Mr. J. J. Tipton. He had owned and lived on it for many years. Three of his children lived near him—his daughter, Mrs. Blackwell, and his sons Emmett and Victor. It appears that for several years Emmett and his father had not been on good terms. Albert lived at Falco, Covington County, a few miles distant from his father, and Walter held a responsible position in Birmingham.

Mr. J. J. Tipton had been in poor health for several months prior to April 4, 1944, when Mrs. Blackwell and the respondent, Victor Tipton, took him to the office of Dr. E. A. Ray in Andalusia. Dr. Ray found him to be in a general run-down condition and suffering from stomach trouble. According to Dr. Ray he was not normal mentally at that time and was obsessed with the idea that he was going to die immediately.

After this visit to the office of Dr. Ray, Victor wrote Walter at Birmingham and notified Albert at Falco that their father was very sick and that if they wanted to see him again they should come at once. On the afternoon of April 11, 1944, Dr. Ray was called to the home of Mr. J. J. Tipton. He found him physically very weak and his mental condition below normal. On this visit, according to Dr. Ray, he notified the family that he could not tell "how long he would last"; that he could not cure him but would try to help relieve the pain.

Walter arrived at his father's home on the morning of April 12th, having received Victor's letter on the 11th. He was planning to leave for a vacation in Florida on the 12th but arranged his plans to go by his father's home and continue on to Florida for his vacation. According to the testimony of Walter and his wife, Mr. J. J. Tipton was, on April 12th, not only sick but highly nervous, expressing the opinion that he was going to die soon. Albert also visited his father on the 12th and his evidence as to his father's condition is substantially the same as that of Walter and wife. Walter continued on to Florida but told the respondent, Victor, that on his return trip he would come back to see his father, and asked Victor to keep him advised as to his father's condition.

On the morning of April 12th or April 13th the respondent, Victor Tipton, in company with his first cousin, J. R. Clark, went to the office of a prominent attorney in the city of Andalusia. Victor asked this attorney to prepare a deed wherein his father, J. J. Tipton, would convey to Victor the 107-acre farm on which his father lived, reserving a life estate to his father and stepmother, Naomi Tipton. Victor told the attorney that J. J. Tipton had requested that such a deed be prepared. The deed was drafted and the attorney told the respondent to get a notary public and two witnesses to go to his father's home for the execution of the deed.

Shortly thereafter respondent went to the home of C. C. Bennett, a notary public in and for Covington County, and according to Mr. Bennett, told him "that Mr. Joel Tipton wanted a deed fixed, and to the best of his knowledge, the way he understood his father, that this was what he wanted, and he said I have had that fixed, and said, 'I want you to take it over there and let him read it, or read it to him, and see if that is what he wants, and if it is let him fix it up and sign

it.' and said, 'if it isn't, of course, I don't want him to sign it.' "

Mr. Bennett, the notary public, in company with C. O. Livingston and J. H. Hicks, arrived at the home of Mr. J. J. Tipton early in the afternoon of April 13, 1944, where, according to Mr. Bennett, the following transpired: "Well, after I got there I told him my business, told him that Victor had brought this instrument over there, and what he said, and I says, Victor made it plain that he wanted you to understand this and to see if it is what you want and if it is all right. And if it isn't, he wants to make it like you want it. And he took it and looked over it for some litle bit, and he says, 'yes, we have talked about that,' and says, 'that is just what I want.' " Thereafter the deed was signed. Hicks and Livingston witnessed it. According to Livingston, Mr. J. J. Tipton did not read the deed but agreed that it contained what he wanted after it was read to him by Mr. Bennett. Separate acknowledgement of Mrs. Naomi Tipton was taken. According to her testimony, she did not know what she was signing, although on the morning of the 13th, she said, she heard the respondent ask his father to let him have the property.

After the deed was executed, Mr. Bennett returned it to the respondent, who had it recorded in the office of the ProbateJudge of Covington County at ten o'clock on the following morning, April 14th.

The respondent shortly thereafter wrote Walter, who was still in Florida, that his father was better and suggested that Walter not come back by to see his father, since the roads had been damaged considerably by excessive rainfall, which advice Walter accepted.

All of the other children of the deceased testified that they knew nothing of the execution of the deed until several days after their father's death. As before shown, Mrs. Blackwell and Emmett lived near the respondent and the deceased, and Albert lived not far distant and visted at his father's home, where he frequently saw the respondent. The respondent admitted that he did not tell his brothers or his sister about the deed until after his father's death.

The respondent testified in his own behalf. He stated that he did not make any request or exercise any influence over his father to get the deed and said that he said "nothing other than I would like for him to make any disposition he wanted to with the land." No attempt was made to explain the circumstances which led up to the father's decision to make this gift to the one son to the exclusion of the other children. The fact that after the deed was executed Mr. J. J. Tipton, in the presence of the respondent, told one Owens in substance that he had deeded the property to the respondent, does not have much influence on the question of undue influence originally exerted.

■ It needs no further discussion to disclose that the burden which was upon the respondent to show the transaction was fair, just, and equitable in every respect has not been discharged.

In view of the conclusion which we have reached as to the ground of undue influence, it is unnecessary that we give consideration to the alternative ground of mental incapacity.

It results from what has been said that the decree of the trial court is in error, and that the same should be set aside, and a decree here rendered pursuant to the prayer of the amended bill. It is so ordered.

Reversed and rendered.

Gardner, C. J., and Foster and Stakely, JJ., concur.