Plaintiff Charles Warner Holloway appeals from a judgment entered in a medical malpractice suit in favor of defendants. We affirm.
On October 26, 1981, Holloway filed suit against Dr. Adam D. Robertson and Dr. Robertson's employer, Jefferson Clinic, P.C., alleging the wrongful death of Holloway's intestate (his mother) Clara Whitman McCain (sometimes hereinafter "the deceased"). Holloway alleges that McCain's death was a result of negligence which occurred on April 15, 1981, in the Cooper Green Hospital emergency room operated *Page 1057 
by Jefferson Clinic under a contract with the hospital.
On April 15, 1981, at approximately 3:00 p.m., McCain suddenly became quite ill. A neighbor called the Warrior Rescue Squad. The emergency technicians who responded to the call recorded McCain's blood pressure at 60/40, which is abnormally low. An emergency technicians' report was prepared, and blood pressure and vital signs were recorded. McCain was taken by ambulance to the Cooper Green Hospital emergency room and arrived there at 4:20 p.m. The emergency technicians' report was delivered to the nurse in attendance at the emergency room.
McCain was initially examined by Susan Hubbard, a nurse employed by Cooper Green Hospital, and then by Dr. Robertson. Dr. Robertson performed a physical examination and ordered chest X-rays on McCain. Dr. Robertson testified that he never saw the emergency technicians' report that contained the rescue squad's recording of McCain's blood pressure at 60/40. He stated that nearly half of these reports never make it to the patient's chart by the time the doctor examines the patient. The blood pressure readings taken at the hospital were considerably higher than that recorded by the rescue squad. Based on the nurse's notes and the results of the physical examination and the chest X-rays, Robertson determined that McCain was suffering from right-sided pleuritic chest pain. This was consistent with her prior history of pleurisy. Pleurisy is an inflammation of the membrane enveloping the lungs and lining the walls of the thoracic cavity. He prescribed Indocin, an anti-inflammatory medication, to relieve the pleuritic chest pain.
Holloway and his wife had been waiting in the emergency waiting room while McCain was being attended to by the medical personnel. At approximately 6:00 p.m., a nurse informed the Holloways that McCain was ready to be released. Mrs. Holloway went into the treatment room to help McCain get dressed. Mrs. Holloway informed a nurse that McCain was throwing up and was not ready to be discharged. Dr. Robertson then reportedly gave McCain a shot for nausea and told the Holloways to call him if they needed him, whereupon McCain was discharged from the emergency room. The Holloways were given written instructions to return if McCain's condition worsened or other problems occurred.
The following morning, Thursday, April 16, 1981, McCain's condition did not improve. She remained very weak, she could not sit up, and she continued to vomit. Holloway telephoned Dr. Robertson several times that day, and at 4:30 p.m., Dr. Robertson returned his call. Holloway informed Dr. Robertson of McCain's condition, and Dr. Robertson replied that these symptoms were expected with side pleurisy and told Holloway to get a laxative for McCain. These instructions were carried out.
That evening, McCain, upon being asked if she wanted to return to the hospital, reportedly stated that she wanted to wait until the morning. At 4:30 a.m. that next morning, April 17, 1981, she was found unconscious. She was taken to Carraway Methodist Hospital. There, Dr. Teiszen, the treating physician, diagnosed her condition as upper gastrointestinal bleeding, perforated ulcer, duodenal ulcer, shock, hypotension, gram negative sepsis, bleeding disorder, kidney failure, and severe hypoglycemia. Surgery was performed on McCain on Friday evening, and a perforated duodenal ulcer was found. Following the operation, her condition progressively declined. She died on Sunday, April 19, 1981.
The trial of this case commenced on March 18, 1985, before a jury. Dr. Tieszen testified that the cause of deceased's death was diagnosed as perforated duodenal ulcer, and that in his opinion, deceased had the perforated ulcer at the time the rescue squad transported her to the emergency room at Cooper Green Hospital. Holloway presented Dr. Tieszen with a hypothetical question that included the facts and circumstances describing deceased's illness *Page 1058 
and the medical treatment rendered to her at the Cooper Green Hospital emergency room. It was his opinion that based on those facts and circumstances, Dr. Robertson did not meet the required standard of care. It was his opinion that Dr. Robertson negligently diagnosed deceased's condition and that deceased should have been admitted to the hospital for further observation. He further opined that Dr. Robertson's negligence contributed to deceased's death. Dr. Talley, Holloway's expert medical witness, also testified that in his opinion the required standard of care had not been met, and that Dr. Robertson's negligence contributed to the deceased's death.
Dr. Robertson's expert medical witness, Dr. Slaughter, testified that there are six symptoms or characteristics commonly associated with a perforated duodenal ulcer: (1) mid-epigastric pain (where the perforation is recent); (2) severe pain; (3) a rigid, board-like abdomen; (4) rebound tenderness; (5) free air under the diaphragm; and (6) a history of ulcers. Dr. Robertson testified that deceased did not present any one of these six symptoms. Dr. Slaughter testified that he has seen patients for duodenal ulcers for over 25 years, and "I would say every patient that I have seen with a perforated duodenal ulcer has presented with more than one of these findings." Dr. Slaughter personally reviewed the chest X-rays of deceased and testified that no free air was visible. Holloway's own medical expert witness, Dr. Talley, testified at his deposition that there was very little about deceased's condition while she was in the emergency room at Cooper Green Hospital which was consistent with peptic ulcer disease.
Dr. Slaughter was also given a hypothetical question incorporating the facts and circumstances of the present case. He was then asked if he had an opinion on whether Dr. Robertson exercised the required standard of care. Dr. Slaughter opined that Dr. Robertson had met the required standard of care.
On March 22, 1985, the jury returned a verdict in favor of Dr. Robertson and Jefferson Clinic. Holloway's motion for new trial was denied, and this appeal followed. The issues are framed as follows by the appellant: (1) whether the trial court committed reversible error by disallowing the opinion of Holloway's expert medical witness on the cause of deceased's death; (2) whether Holloway was entitled to a new trial because of alleged prejudice resulting from the change in Dr. Robertson's testimony at trial from the testimony given at his prior deposition; (3) whether Holloway was entitled to a new trial based on the allegedly erroneous ruling of the trial court that Holloway could not lead or impeach his rebuttal witness; (4) whether the verdict was against the great weight of the evidence so that a new trial should have been granted.
 I.
Holloway contends that the trial court committed reversible error by rejecting the opinion of Holloway's expert medical witness, Dr. Talley, on the cause of deceased's death. After a careful review of the record, we find no error as alleged.
Holloway, through the use of a hypothetical question, attempted to elicit Dr. Talley's opinion that Dr. Robertson's failure to diagnose deceased's ulcer contributed to or caused deceased's death. After Holloway's attorney read the hypothetical question to the expert, the following transpired:
 "Q. . . . Based upon the facts I just read to you and the prior hypothetical and your education, training and experience, do you have an opinion to a reasonable degree of medical certainty as to whether or not the breach of the standard of care which you answered in the first hypothetical question contributed to or caused this patient's death?
". . .
"A. Well, yes, I think it contributed, yes.
 "Q. All right, sir. Would you explain to the jury how you think it contributed?
 "A. No one could really know the outcome had the patient been observed properly *Page 1059 
the first admission. There is no way of knowing that.
 "But one — I think almost anyone would agree, especially knowing the outcome, that proper care at that time might have altered the outcome. And, yes, I think it likely would have altered the outcome. . . . Would have improved considerably her chances of survival.
 "Q. All right. Doctor, did you find, in the reading of the records there of Mrs. McCain in the two hospitals' emergency rooms, did you find the facts there that were given to you in this hypothetical question? Even though you found more, were these facts in there, in your opinion?
 "A. Yes. I made that opinion based on what I have read in the records.
". . .
 "MR. STARNES: Your Honor, move to exclude his opinion.
 "THE COURT: The Court is going to exclude the opinion if it's based upon what was read in the record.
". . .
 ". . . [T]hat gets back to the credibility of the records, saying those records are correct, and that's not the issue."
On the following day of the trial, Holloway continued his direct examination of Dr. Talley. Holloway again presented the same hypothetical question incorporating the facts and circumstances of the deceased's case, and asked the expert witness if he had an opinion as to whether the failure to evaluate and treat the hypothetical patient contributed to or caused the hypothetical patient's death. Robertson again objected to the question, and after an off-the-record discussion between the trial judge and the parties, the following occurred:
 "Q. All right, sir. Dr. Talley, you answered this question yesterday in the affirmative and it is repetition, so I will not repeat it.
 "MR. STARNES: Excuse me. Ask the jury to disregard that.
 "THE COURT: Ladies and gentlemen, please disregard the remarks of counsel in this case. Please strike that.
 "Q. Well, I will ask you, doctor, did you answer that in the affirmative yesterday?
"A. Yes, I did."
(Emphasis added.)
The jury was allowed to consider Dr. Talley's opinion that Dr. Robertson's failure to meet the standard of care contributed to deceased's death. Whether the question was properly framed and whether it would have been error to exclude the answer is not before us. A party cannot claim error where no adverse ruling is made against him. Here the expert was allowed to state his opinion to the hypothetical framed by the appellant. There was no error as alleged.
 II.
Holloway next contends that he was prevented from fully and fairly presenting his case because of a change in Dr. Robertson's testimony at trial from that which was given during his deposition. The general rule is that a party may properly be impeached by contradictions and inconsistencies between his testimony at trial and his testimony at a prior deposition.Yates v. Christian Benevolent Funeral Homes, Inc.,356 So.2d 135 (Ala. 1978); Harrison v. McCleary, 281 Ala. 87,199 So.2d 165 (1967).
Holloway contends, however, that the change in Dr. Robertson's testimony so prejudiced his case that the trial court should have granted him a new trial. Specifically, Holloway claims that Dr. Robertson stated during his deposition that the nurses in the emergency room at Cooper Green Hospital were under his direction, supervision, and control. Based on this testimony Holloway contends that prior to trial he had the right to assume that there was an agency relationship between Dr. Robertson and the nurses. During trial, however, Dr. Robertson testified that the nurses in the emergency room were not under his direction and control, thereby *Page 1060 
disclaiming a principal-agent relationship with the nurses. Holloway claims that establishing an agency relationship between Dr. Robertson and the nurses was essential to his case. He argues that he wanted to impute the substance of conversations between Holloway's wife and the emergency room nurse which would otherwise have been excluded as hearsay. This evidence would have supplied an inference that Dr. Robertson had notice of deceased's poor condition prior to her discharge on April 15, 1981, but allowed her to be discharged notwithstanding this knowledge. Second, Holloway contends that it was necessary to establish the agency relationship in order to hold Dr. Robertson liable under principles of respondeat superior for certain alleged wrongful acts of the emergency room nurses who cared for the deceased.
With regard to the conversations that would tend to show that Dr. Robertson had notice of deceased's poor condition upon arrival at the emergency room, the record shows that the trial court not only allowed this testimony, but specifically ruled that the nurse was Dr. Robertson's agent:
 "THE COURT: . . . I think that yes, it could show that she's a borrowed servant at this point. . . .
 "Now, at this point, I would say that she is his agent. And, if you want to recall her, I will let you ask that question.
"MR. LANGNER: Thank you.
 "MR. STARNES: Are you saying, Your Honor, that the nurse — they have proven that the nurse was an agent of Dr. Robertson for the purposes of this conversation between Ms. Holloway without proving the nurse related that to Dr. Robertson, without proof it was in her agency to have such conversations, Judge?
 "THE COURT: Well, I think, from looking at this deposition, it says basically that she's under his control. Those three nurses are under his control and under his supervision. And this is the principal saying that. This is not the agent saying that.
 "MR. STARNES: Well, first of all, his testimony at the deposition as he explained here to Your Honor on the witness stand, the nurse is under his control for the purpose of carrying out his medical orders.
 "But they're under the ultimate control and supervision — they're employees of the hospital. He can't hire and fire them. . . .
". . .
 "THE COURT: Well, I don't see the distinction, Stan. I am going to go ahead and allow it. So if he wants to recall the witness. . . ."
As evidenced above, the change in the testimony did not prejudice Holloway in establishing that Dr. Robertson was on notice of deceased's condition at the time of her discharge.
Nor do we find that the change in Dr. Robertson's testimony prevented Holloway from presenting evidence of the nurse's alleged wrongdoings. Holloway was attempting to show through various witnesses that deceased's blood pressure entries on her medical records had been altered or changed, and that these changes had not been done in accordance with the procedures established by the hospital. Holloway was allowed to question nurse Susan Hubbard extensively about the alleged changes. Several other witnesses, including Dr. Robertson, were asked about the alleged alterations of deceased's blood pressure entries on her medical records, and about the proper hospital procedures for changing information recorded on medical records. The jury was allowed to consider this testimony and draw inferences from the testimony. The jury chose to believe that no wrongdoing was committed by Dr. Robertson or his nurses. We do not find that the change in Dr. Robertson's testimony caused any prejudice to Holloway's case.
The granting or refusing of a motion for a new trial rests within the sound discretion of the trial court, and this Court will not disturb the exercise of that discretion unless some legal right was abused and the *Page 1061 
record plainly and palpably shows that the trial court was in error. Hill v. Cherry, 379 So.2d 590 (Ala. 1980). No such showing has been made. The trial court did not err in denying Holloway's motion for new trial on this ground.
 III.
The next issue raised by Holloway is whether the trial court erred when it ruled that Holloway could not lead or impeach Hubbard, a rebuttal witness called by Holloway.
During Holloway's examination of Hubbard, Hubbard originally testified that she had no independent recollection of what deceased looked like or what she had done for the deceased in the emergency room. She testified that she did not remember anything with regard to whether she had changed the blood pressure entries on deceased's medical records.
On re-direct examination of Hubbard, Holloway asked Hubbard again if she knew who had made the alleged changes in the blood pressure recordings in deceased's medical records:
"A. Well, I think I did. I probably did.
 "Q. Well, now, Susan, a while ago, I was very careful to try to get you to truthfully tell the jury what you remembered, and you said you absolutely had no independent recollection of that.
"A. I don't remember, but I assume. . . .
"Q. Well, that's all right.
"A. — that I did.
". . .
"A. I said, I don't remember changing it.
". . .
 "A. But I assume that I did change it or that I did mark through it.
 "Q. Well, Susan, a while ago when I asked you that question, I was trying to be as specific and fair as I could about it.
 "And I asked you if you had any independent recollection whatsoever about this. And I believe your answer was no?
"A. Right.
 "MR. STARNES: I object to that, Your Honor. He's impeaching his own witness and leading his own witness.
"THE COURT: Sustained."
Holloway, citing Rule 43(b) of the Alabama Rules of Civil Procedure, contends that he should have been allowed to lead and impeach Hubbard because she was an unwilling, hostile, and adverse witness. Holloway contends that because he was prejudiced by the trial court's ruling, he should be granted a new trial. We disagree.
First, as evidenced by the testimony above, Holloway had the opportunity to ask several leading and impeaching questions concerning Hubbard's inconsistent testimony. Hubbard was allowed to answer, and her answers were not stricken from the record. The jury was given the opportunity to judge her credibility. In order to warrant reversal, any alleged error must be prejudicial and must affect the substantial rights of the party. Village Toyota Co. v. Stewart, 433 So.2d 1150
(Ala. 1983).
Furthermore, it is not clear from the record that Hubbard was, in fact, a hostile or adverse witness. She did not testify for the defense. At the time of trial, she no longer had any connection with Robertson or Jefferson Clinic; she was a law student and a law clerk. A party may impeach his own witness if the trial judge determines the witness to be adverse, but the decision to label a witness hostile or adverse is within the discretion of the trial judge, and he must make his decision based on the facts and circumstances involved in each particular case. Weaver v. State, 466 So.2d 1037
(Ala.Cr.App. 1985). The usual rule is that, when a party places a witness on the stand, he thereby vouches for his credibility, and cannot impeach his own witness. Cone v. Ragan, 288 Ala. 352, 261 So.2d 28 (1972). We find no reversible error.
 IV.
The final issue presented for review is whether Holloway is entitled to a new trial *Page 1062 
based on his allegation that the verdict was against the great weight of the evidence.
A great deal of medical testimony was presented on behalf of both parties. The appellate court must view the tendencies of the evidence most favorably to the prevailing (non-moving) party and must indulge such inferences as the jury was free to draw. Cooper v. Peturis, 384 So.2d 1087 (Ala. 1980). A judgment based on a jury verdict will not be reversed on appeal unless the evidence is so preponderant against the verdict as to clearly indicate that it was palpably wrong or manifestly unjust. Mahoney v. Forsman, 437 So.2d 1030 (Ala. 1983). Having carefully reviewed the record, we find that the verdict is supported by the evidence and is not palpably wrong or manifestly unjust.
The judgment in favor of Dr. Robertson and Jefferson Clinic is due to be affirmed.
AFFIRMED.
TORBERT, C.J., and JONES, ADAMS and STEAGALL, JJ., concur.