BRYAN, Judge.
A. J. Brown (“A.J.”) appeals from a judgment canceling two deeds executed by Robert Barry Brown (“R.B.”) on July 21, 2006, on the ground that they had resulted from A. J.’s exercising undue influence over R.B. We dismiss the appeal in part and affirm the judgment of .the trial court.[1]
R.B. and Emily Brown (“Emily”) married in 1952 and had four children; A.J. is the youngest of those four children. On March 12, 2006, R.B. suffered a stroke. On March 28, 2006, the DeKalb Probate Court appointed A.J. and one of his siblings, Robert Donald Brown, to serve as temporary conservators and guardians for R.B.; however, the last extension of their appointments expired on May 26, 2006, and their appointments were not extended beyond that date. On July 21, 2006, R.B. executed two deeds conveying land to A.J.; one of the deeds was a warranty deed and the other was a quitclaim deed. On July 25, 2006, an attorney was appointed to serve as conservator and guardian for R.B. On August 7, 2006, R.B. executed a deed conveying property to Emily.
*718 On August 29, 2006, Emily sued A.J. and R.B. in the DeKalb Circuit Court. In her complaint, as amended, Emily stated claims seeking the cancellation of the two July 21, 2006, deeds conveying property from R.B. to A.J. and claims seeking damages from A.J. based on various theories. Her claims seeking cancellation of the July 21, 2006, deeds asserted that the deeds were due to be canceled on the grounds (1) that they purported to convey, without her consent, property in which she owned a homestead interest; (2) that they had resulted from A.J.’s exercising undue influence over R.B.; and (3) that they were executed by R.B. when he lacked the requisite mental competency.
R.B., who was represented by his conservator and guardian, and A.J. filed separate answers denying the allegations of Emily’s complaint. In addition, they jointly filed a counterclaim stating a claim seeking the cancellation of the August 7, 2006, deed conveying property from R.B. to Emily and claims seeking damages from Emily based on various theories.
R.B. died on October 12, 2007, and the DeKalb Probate Court appointed a special administrator of his estate. The special administrator moved to substitute R.B.’s estate as a party in this action, and the trial court granted that motion. On March 13, 2008, the special administrator moved for a summary judgment with respect to R.B.’s claim seeking the cancellation of the August 7, 2006, deed conveying property from R.B. to Emily. Although the record does not appear to contain a pleading in which the special administrator asserted a claim seeking the cancellation of the two July 21, 2006, deeds conveying property from R.B. to A.J., the record contains a motion that was filed by the special administrator on April 2, 2008, seeking a summary judgment with respect to such a claim. On May 23, 2008, the trial court entered an order granting the special administrator’s summary-judgment motion with respect to his claim seeking the cancellation of the August 7, 2006, deed on the ground that R.B. was represented by a conservator and guardian on that date and, therefore, lacked the power to execute the August 7, 2006, deed. However, the May 23, 2008, order denied the special administrator’s summary-judgment motion with respect to his claim seeking the cancellation of the two July 21, 2006, deeds because the trial court concluded that R.B. was not represented by a conservator and guardian on the date he executed those deeds and that a genuine issue of material fact existed regarding whether R.B. was mentally competent when he executed those deeds.
Subsequently, Emily was appointed executrix of R.B.’s estate, and his estate was realigned as a plaintiff. A.J. then moved for a judgment on the pleadings with respect to R.B.’s estate on the ground that R.B.’s estate had not pleaded any claims against A.J., and the trial court granted that motion.
On July 2, 2009, the trial court bifurcated the remaining claims for trial. The trial court ordered that Emily’s claims seeking cancellation of the two July 21, 2006, deeds conveying property from R.B. to A.J. would be tried by the trial court sitting without a jury and that, after those claims were adjudicated, all other pending claims would be tried by a jury.
Emily’s claims seeking cancellation of the two July 21, 2006, deeds were tried in a bench trial on February 18 and 19, and April 27 and 28, 2010. In May 2010, Emily and A.J. each filed posttrial briefs. In addition to arguing that he was entitled to prevail on the merits with respect to Emily’s claims seeking cancellation of the July 21, 2006, deeds, A.J. asserted in his post-trial brief that he was entitled to a judgment declaring that Emily had never *719 owned any interest in the property that was the subject of one of the July 21, 2006, deeds, i.e., the quitclaim deed, because, he said, the evidence had established that (1) R.B. and Emily had executed two deeds, one on December 27, 2002, and the other on January 2, 2003, in which they had deeded to A.J. and his son, subject to life estates reserved by R.B. and Emily, the property that was the subject of the July 21, 2006, quitclaim deed and (2) that Emily had never owned an interest in that property and, therefore, could not reserve a life estate in it in the December 27, 2002, and January 2, 2003, deeds. Thus, A.J. argued, upon R.B.’s death on October 12, 2007, his life estate expired and A.J. and his son became the owners of the entire fee-simple interest in the property that was the subject of the July, 21, 2006, quitclaim deed regardless of whether the July 21, 2006, quitclaim deed was valid.
On August 12, 2010, the trial court entered a judgment adjudicating Emily’s claims seeking cancellation of the July 21, 2006, deeds. In pertinent part, the August 12, 2010, judgment states:
“[R.B.] died on October 12, 2007. On March 12, 2006, he suffered a massive stroke that left him severely paralyzed. As a result of the stroke, he was initially hospitalized at Erlanger Medical Center in Chattanooga, Tennessee, later moved to Siskin Rehabilitation Center, and then to Standifer Place Nursing Home in Chattanooga, where he remained, except for a four-day stay with A. J. in May 2006, until September 28, 2006, at which time he returned to his home in DeKalb County, Alabama.
“[R.B.] accumulated substantial land holdings in DeKalb County during his lifetime, some by purchase and some by inheritance from his family. The deeds that the court is asked to set aside conveyed 1285 acres of farm land to A.J. valued at 1.5 to 2 million dollars. Other property remaining in [R.B.’s] name at the time of his death consisted of a cabin, two undeveloped lots, and a tract containing 114 acres. The marital residence located on 69-acre tract was conveyed by [R.B.] to [Emily], prior to his death.
“[R.B.] and [Emily] were married in 1952 and had four children: Cindy Brown Meadows, Robert Donald Brown, Chris Brown, and Arthur James Brown, a/k/a A.J. Over the years, [R.B.] and [Emily] Brown conveyed various tracts of property to their children, and they all lived on family property in close proximity to each other. [R.B.], also known as ‘Bear’ was a big man with a strong personality and was considered head of the Brown family. Ownership of land was important to him, and his use of the land was his and [Emily’s] primary source of income for several years prior to the time of his stroke. This income consisted of selling fishing and hunting rights on the land, selling timber from the land, and receiving payments from the U.S. Department of Agriculture [ (‘the USDA’) ] by placing certain land into its farm and timber programs. [R.B. and Emily] sold a tract of land in 1992 for a substantial sum, using the proceeds to pay off a loan and to build the marital residence.
“The first basis asserted by [Emily] for setting aside the subject conveyances is that the lands conveyed by [R.B.] to A.J. were , part of [R.B. and Emily’s] homestead and could not be conveyed by [R.B.] without her assent. A.J. insists, however, that the homestead is limited to the marital residence and the 69-acre tract upon which it is located, a tract that is separate and apart from and not contiguous to the lands conveyed to him by [R.B.].
“[Emily] maintains that a [‘]homestead[’] is the home where a family resides and any adjoining or appurtenant *720 land used for the family’s comfort and sustenance. She points to the fact that a substantial portion of [R.B. and Emily’s] annual income at the time of [R.B.’s] stroke came from USDA payments, and that the land that produced these payments is a portion of the land that was conveyed by [R.B.] to A.J. on July 21, 2006. Once these conveyances to A.J. occurred, the USDA payments went to him. [Emily] maintains that because the land conveyed to A.J. was used for the family’s sustenance, it is part of the homestead.
“By statute, no conveyance of the homestead by a married person shall be valid without the voluntary signature and assent of the husband or wife. Section 6-10-3, Code of Alabama (1975). In construing the definition of [‘]home-steadf] as used in this statute, the Alabama Supreme Court has generally found it to be limited to property consisting of a home and land not exceeding in value $5,000 and 160 acres in area. See Sims v. Cox, 611 So.2d 339 (Ala.1992).
“Given the fact that the marital residence of [R.B. and Emily] and the 69-acre tract on which it is located far exceeds in value the $5,000 limitation, such residence and acreage being estimated to have a value of no less than $300,000 to $350,000, and the further fact that it is located on a tract separate and apart from the land that was conveyed to A.J., the court finds that the land conveyed to A.J. is not part of the homestead and that the conveyance did not require the signature of [Emily].
“Next, [Emily] contends that the conveyance from [R.B.] to A.J. resulted from undue influence. A.J. denies this allegation.
“The resolution of this issue is guided by' some well established principles of law. The relation of parent and child is per se a confidential one with the law presuming that the parent is the dominant spirit. In such instances, the law further presumes that any transaction between the parent and child is free from undue influence. If, however, it is made to appear to the reasonable satisfaction of the court that the child, and not the parent, is the dominant spirit, then the presumption is reversed and the burden of proof shifts to the child who has benefitted from the transaction to show that the transaction was fair, just, and equitable in every respect and that it was not the result of undue influence. Chandler v. Chandler, 514 So.2d 1307 (Ala.1987); Dillard v. Hovater, 254 Ala. 616, 49 So.2d 151 (1950).
“Undue influence with respect to gifts and conveyances inter vivos may exist without either coercion or fraud. It may result entirely from the confidential relation, without activity in the direction of either coercion or fraud on the part of the beneficiary occupying the position of dominant influence. It is upon the person occupying the position of dominant influence not only to abstain from deceit and duress but to affirmatively guard the interests of the weaker party so that their dealing may be upon a plane of equality and at arm’s length. Chandler v. Chandler, supra.
“A.J. has cited for the court’s consideration the recently decided case of Murphy v. Motherway, [66 So.3d 770 (Ala.Civ.App.2010) ], for the proposition that there must be interference by the allegedly dominant party and such interference must go beyond mere compliance with the voluntary directions of the weaker party. The Murphy case, however deals primarily with a will contest, and it is well established that a different standard applies in a will contest than in an inter vivos. transfer. Chandler v. Chandler, supra. The court finds nothing in Murphy, supra, that changes the *721 well established principles set forth in Chandler, supra.
“In determining whether [R.B.] was the dominant spirit in the transaction between him and A.J. on July 21, 2006, the state of [R.B.’s] physical and mental health becomes a primary consideration.
“[R.B.] was 72 years of age at the time of the transaction. There is evidence that the stroke he suffered on March 12, 2006, was a hemorrhagic stroke that destroyed the thalamus portion of his brain. The severe paralysis that he suffered left him bedridden except on those occasions when he was removed from the bed with a lift. His speech was impaired, and his cognitive function damaged. For some period following the stroke he was incapable of receiving nourishment except through a feeding tube.
“Dr. William H. Coleman, a medical doctor who also holds a masters degree and a PhD in anatomy, testified that injury to the thalamus such as [R.B.] suffered impairs short-term memory, destroys one’s ability to perform executive functions, and affects one’s ability to reason and understand the ramifications of their decisions. Dr. Coleman testified that in his opinion a person who suffered a stroke like the one [R.B.] suffered was not capable of making decisions about property, and that because of the total dependency caused by the stroke, one could be very easily influenced by others.
“A letter from one of [R.B.’s] treating physicians dated April 18, 2006, stated that [R.B.] was unable to manage any financial affairs and that he needed a guardian. A.J. and his brother, Robert Donald Brown, thereafter served for a period as their father’s guardians and conservators, and, in that capacity, transacted business affairs that would normally have been handled by their father. A.J. also transacted some affairs for his father pursuant to a power of attorney. A.J. and his brother also made health decisions for their father at his request.
“There is evidence that [R.B.] was capable at times after the stroke of conversing rationally with family members, caregivers, and attorneys, and that he scored satisfactorily on a ‘mini-mental exam.’ A psychiatrist examined [R.B.] on July 22, 2006, the day after the conveyances were executed, and concluded that he did not have impairment of mental functions on that date. The psychiatrist testified that [R.B.] expressed a desire to make a will or other disposition of some land but made no mention of having made conveyances the day before. The psychiatrist was unaware at the time that [R.B.] had made the conveyances.
“[R.B.’s] cognitive status was not constant. The nurses’ notes at Standifer Place for June 28, 2008, reflect that [R.B.’s] cognitive status and self-sufficiency had deteriorated. Their notes for July 10, 2006, stated that [R.B.] was somewhat confused, and the notes for July 20, 2006, state that he had difficulty finding words and finishing thoughts.
“[Emily] testified that her husband enjoyed playing solitaire prior to the stroke but was incapable of doing so afterward. She testified that he did not like to leave his room at Standifer Place, but on occasions when he did so and she would roll him back to his room, he sometimes would not recognize the room as being his room. One of the sons, Robert [Donald] Brown, testified that one day his father failed to recognize his grandson whom he had been very close to before the stroke. He also testified that his father acted much like a child.
“It is undisputed that following the stroke, [R.B.] became totally dependent *722 on others for all of his needs, and that condition continued until his death. He relied upon others to make his healthcare decisions and to attend to his business affairs. One of the people he relied upon most heavily was A. J.
“Considering the evidence as a whole and particularly [R.B.’s] state of total dependence on others following the stroke, the court is reasonably satisfied by substantial evidence that his dominion in the parent-child relationship had ceased at the time of the conveyances here in question and that, in his relationship with A.J., A.J. had come to occupy the position of dominance.
“It follows from this conclusion that the conveyances to A.J. by his father on July 21, 2006, are presumed to be the product of undue influence and A.J. has the burden of showing that the transaction was fair, just, and equitable in every respect.
“A.J. has offered creditable evidence that his father had expressed his intention for [A.J.] to have the lands that were the subject of the conveyances because [R.B.] believed that A.J. would hold the lands and keep them together for future generations. A.J. testified that, consistent with that expression of intent, his father requested and insisted that he secure the services of an attorney to prepare the deeds.
“A.J. did, in fact, make arrangements for and pay an attorney to prepare the deeds and to come to Standifer Place to oversee their execution by his father.
“Robert [Donald] Brown testified, however, that A.J. ‘hounded’ their father to make deeds, and [Emily] testified that on one occasion when she walked into her husband’s room at Standifer Place, A.J. was bent over [R.B.] telling him what property he should deed to [R.B. and Emily’s] son, Chris.
“Because there is substantial evidence of [R.B.’s] expressed desire for A.J. to have the subject property, the court is not convinced that the conveyances to A.J. resulted from fraud or coercion. The court finds, however, that A.J. has failed to overcome the presumption of undue influence and has failed to show that the conveyances to him were fair, just, and equitable in every respect. Moreover, A.J. has failed to show that, in arranging for the conveyances to be made, he was affirmatively guarding the interests of his father.
“By taking title to the lands and, thereby, becoming the recipient of the USDA payments, A.J. deprived his father and mother of those payments which had been a substantial part of their total income in the recent past. In 2005, the year immediately prior to [R.B.’s] stroke, [R.B. and Emily’s] income tax return reported total taxable income of $13,859, of which $13,265 came from USDA payments. [Emily] testified that her husband had frequently stated that the payments from USDA would be their retirement income. The termination of those payments to [R.B.] and [Emily] after the conveyances to A.J. was inconsistent with such expressions of [R.B.’s] intent. There is also evidence that [R.B.] and [Emily] had discussed devising the subject lands to A.J. at their deaths, a scenario that would have allowed A.J. to eventually own the lands but also allowed [R.B.] and [Emily] to retain the income from them during their lifetimes.
“For the reasons set forth, the court finds that the deeds executed by [R.B.] to A.J. ... on July 21, 2006, were the product of undue influence on the part of A.J. ... and are due be set aside and vacated. It is unnecessary for the court to address the issue of whether [R.B.] *723 was mentally incompetent to execute the deeds.
“Accordingly, it is adjudged and decreed that the deeds executed by R.B. ... to A.J. ... bearing date of July 21, 2006, ... are hereby set aside and vacated.”
After the trial court entered the August 12, 2010, judgment, A.J. filed a posttrial motion asking the trial court to reconsider the August 12, 2010, judgment. He also filed a motion pursuant to Rule 15(b), Ala. R. Civ. P. A.J.’s Rule 15(b) motion alleged that the issue whether Emily had ever owned an interest in the property that was the subject of the July 21, 2006, quitclaim deed had been tried without objection by Emily. The Rule 15(b) motion further alleged that the evidence had established (1) that R.B. and Emily had executed deeds dated December 27, 2002, and January 2, 2003, conveying to A.J. and his son, subject to life estates reserved by R.B. and Emily, the property that was the subject of the July 21, 2006, quitclaim deed and (2) that Emily had never owned an interest in that property and, therefore, could not have reserved a life estate in it. Thus, according to A.J., upon R.B.’s death on October 12, 2007, R.B.’s life estate had expired and A.J. and his son had become the owners of the entire fee-simple interest in that property regardless of whether the July 21, 2006, quitclaim deed was valid. The Rule 15(b) motion asked the trial court (1) to amend the pleadings to state a claim by A. J. seeking a determination that Emily had never owned an interest in that property and (2) to enter an order determining the ownership of that property.
On October 6, 2010, the trial court denied AJ.’s motion to reconsider the August 12, 2010, judgment and his Rule 15(b) motion. Although the August 12, 2010, judgment was not a final judgment because it had disposed of fewer than all the parties’ claims, see Heaston v. Nabors, 889 So.2d 588, 590 (Ala.Civ.App.2004) (“A final judgment is one that disposes of all the claims and controversies between the parties.”), and although the trial court had not certified the August 12, 2010, judgment as a final judgment pursuant to Rule 54(b), Ala. R. Civ. P., A.J. nonetheless filed a notice of appeal to the supreme court on November 16, 2010. On December 1, 2010, the supreme court transferred the appeal to this court pursuant to § 12-2-7(6), Ala.Code 1975. On January 27, 2011, at the behest of the parties, the trial judge entered an order purporting to certify the August 12, 2010, judgment as a final judgment pursuant to Rule 54(b), Ala. R. Civ. P.
However, the premature notice of appeal A.J. had filed on November 16, 2010, had divested the trial court of jurisdiction. See Busby v. Lewis, 993 So.2d 31, 34 (Ala.Civ.App.2008). Consequently, the January 27, 2011, order purporting to certify the trial court’s August 12, 2010, judgment as a final judgment pursuant to Rule 54(b) was void. Id. Accordingly, on August 4, 2011, this court remanded the cause to the trial court for seven days so that it could certify its August 12, 2010, judgment as a final judgment pursuant to Rule 54(b). The trial court entered an order certifying the August 12, 2010, judgment as a final judgment on August 9, 2011.
Because the trial court received evidence ore tenus, our review is governed by the following principles:
“ ‘ “ ‘[W]hen a trial court hears ore tenus testimony, its findings on disputed facts are presumed correct and its judgment based on those findings will not be reversed unless the judgment is palpably erroneous or manifestly unjust.’ ” ’ Water Works & Sanitary Sewer Bd. v. Parks, 977 So.2d 440, 443 (Ala.2007) (quoting Fadalla v. Fadalla, 929 So.2d 429, 433 (Ala.2005), quoting in turn Phil- *724 pot v. State, 843 So.2d 122, 125 (Ala.2002)). ‘ “The presumption of correctness, however, is rebuttable and may be overcome where there is insufficient evidence presented to the trial court to sustain its judgment.” ’ Waltman v. Rowell, 913 So.2d 1083, 1086 (Ala.2005) (quoting Dennis v. Dobbs, 474 So.2d 77, 79 (Ala.1985)). ‘Additionally, the ore tenus rule does not extend to cloak with a presumption of correctness a trial judge’s conclusions of law or the incorrect application of law to the facts.’ Waltman v. Rowell, 913 So.2d at 1086.”
Retail Developers of Alabama, LLC v. East Gadsden Golf Club, Inc., 985 So.2d 924, 929 (Ala.2007).
A.J. argues that the trial court erred in canceling the July 21, 2006, deeds based on undue influence because, he says, (1) the trial court applied the wrong standard of proof to determine whether A.J. had become the dominant party in his relationship with R.B. and (2) the evidence does not support the trial court’s conclusion that A.J. had become the dominant party in his relationship with R.B.
In Chandler v. Chandler, 514 So.2d 1307, 1308 (Ala.1987), the supreme court held that a plaintiff seeking to cancel an inter vivos transfer of property from a parent to a child based on undue influence meets his or her initial burden of proof by introducing sufficient evidence to reasonably satisfy the trial court that the child had become the dominant party in his or her relationship with the parent:
“The relation of parent and child is per se a confidential one. The law presumes that the parent is the dominant spirit, but this presumption is not conclusive. ‘Where it is made to appear by the proof that the child, and not the parent, is the dominant spirit, then the burden of proof is shifted to the former to establish the fairness of the transaction, and that it was not the result of undue influence.’ Dowe v. Farley, 206 Ala. 421, 422, 90 So. 291, 292 (1921); Tipton v. Tipton, 249 Ala. 537, 539, 32 So.2d 32, 34 (1947). See also, Jones v. Boothe, 270 Ala. 420, 119 So.2d 203 (1960); Orton v. Gay, 285 Ala. 270, 231 So.2d 305 (1970); Wolfe v. Thompson, 285 Ala. 745, 235 So.2d 878 (1970)....
“... The party seeking to have the deed set aside need only show to the reasonable satisfaction of the court that the grantee was the dominant party in a confidential relationship with the grant- or, whereupon the burden shifts to the grantee to show that the transaction was ‘fair, just, and equitable in every respect.’ Brothers v. Moore, ... 349 So.2d [1107,] 1109 [ (Ala.1977) ].”
(Emphasis added.)
In Wilson v. Wehunt, 631 So.2d 991, 993 (Ala.1994), the supreme court considered a claim seeking to cancel an inter vivos transfer of property from a parent to a child and discussed the proof necessary to establish that the child has become the dominant party in his or her relationship with the parent:
“It is well settled that one alleging dominance of a child over a parent must prove that ‘time and circumstances have reversed the order of nature, so that the dominion of the parent has not merely ceased, but has been displaced, by subservience to the child.’ Hawthorne v. Jenkins, 182 Ala. 255, 260, 62 So. 505, 506 (1913) (emphasis in original).... Black’s Law Dictionary 486 (6th ed.1990) defines ‘dominate’ as ‘[t]o master, to rule, or to control.’ Thus, for the burden of proof to shift, it is clear that our cases require proof of more than a reversal of the traditional roles of parent as care giver and child as care recipient; they require proof that the parent’s will has become subordinate to the will of *725 the child. It is also clear from our cases that the mere relationship of parent and child alone, even when coupled with some activity on the part of the child in securing the preparation of legal papers for the parent, is not sufficient to prove subservience on the part of the parent, so as to shift to the child the burden of proving an absence of undue influence.”
In the case now before us, Dr. William H. Coleman, a physician who has not only an M.D. degree but also a masters degree and a Ph.D. degree in anatomy, testified as an expert witness. Dr. Coleman testified that R.B. had a massive hemorrhagic stroke on March 12, 2006, that completely destroyed the right lobe of the thalamus of his brain. Dr. Coleman testified that, as a result of the destruction of the right lobe of his thalamus, R.B., after his stroke, would not have been able to balance a checkbook or monitor his finances. According to Dr. Coleman, the destruction of the right lobe of his thalamus deprived R.B. of the ability to take in information, organize it, correlate it, reason based on it, and arrive at an opinion of his own. Dr. Coleman testified that, after his stroke, R.B. had the cognitive ability of a seven- or eight-year-old child and could be easily influenced. Finally, Dr. Coleman testified that the destruction of the right lobe of R.B.’s thalamus could not be reversed and that he could never have regained the cognitive abilities he had lost as a result of his stroke.
The trial court also had before it evidence indicating that R.B. never handled any of his own business affairs after his stroke, that he was bedridden, that he was paralyzed on his left side, and that he was particularly dependent on A.J. The evidence established not only that A.J. had made arrangements for an attorney to prepare the July 26, 2006, deeds and to come to Standifer Place to oversee their execution by R.B. but also that A.J. had made those arrangements without Emily’s knowledge. The evidence before the trial court also established that, on July 9, 2006, A.J. sought the assistance of the nurses at Standifer Place in removing Emily from R.B.’s room.
Although there was also evidence before the trial court that conflicted with some of the evidence described above, the trial court was the sole judge of the facts and of the credibility of witnesses and was entitled to accept the evidence described above and to reject the conflicting evidence. See Woods v. Woods, 653 So.2d 312, 314 (Ala.Civ.App.1994). The evidence described above was sufficient to reasonably satisfy the trial court that, after R.B.’s stroke, A.J. had become the dominant party in his relationship with R.B. under the principles set forth in Chandler v. Chandler, supra, and Wilson v. Wehunt, supra. Accordingly, we affirm the trial court’s judgment insofar as it canceled the July 21, 2006, deeds based on undue influence.
A.J. also argues that the trial court erred (1) in denying his Rule 15(b) motion asking the trial court to amend the pleadings to conform to the evidence by adding a claim by A.J. seeking a determination that Emily owned no interest in the property that was the subject of the July 21, 2006, quitclaim deed regardless of whether the July 21, 2006, quitclaim deed was valid and (2) in failing to rule on that claim.
Rule 15(b) states:
“When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; but failure so to amend does not affect the *726 result of the trial of these issues. If evidence is objected to at the trial on the ground that it is not within the issues made by the pleadings, the court may allow the pleadings to be amended and shall do so freely when the presentation of the merits of the action will be sub-served thereby and the objecting party fails to satisfy the court that the admission of such evidence would prejudice the party in maintaining the party’s action or defense upon the merits. The court may grant a continuance to enable the objecting party to meet such evidence. An amendment shall not be refused under subdivision (a) and (b) of this rule solely because it adds a claim or defense, changes a claim or defense, or works a complete change in parties. The Court is to be liberal in granting permission to amend when justice so requires.”
(Emphasis added.) See also Rule 54(c), Ala. R. Civ. P. (“every final judgment shall grant the relief to which the party in whose favor it is rendered is entitled, even if the party has not demanded such relief in the party’s pleadings”).
“‘Rule 15(b) is not permissive: it provides that issues tried by express or implied consent shall be treated as if raised in the pleadings.’ ” Ammons v. Tesker Mfg. Corp., 853 So.2d 210, 216 (Ala.2002) (quoting Hawk v. Bavarian Motor Works, 342 So.2d 355, 358 (Ala.1977)). “ ‘We also note that a determination “as to whether [an] issue has been tried by express or implied consent under Rule 15(b) is a matter for the trial court’s sound discretion, which will not be altered on appeal absent an abuse [of that discretion].” ’ ” Id. (quoting International Rehab. Assocs., Inc. v. Adams, 613 So.2d 1207, 1214 (Ala.1992), quoting in turn McCollum v. Reeves, 521 So.2d 13, 16 (Ala.1987)).
A. J. argues that evidence that was introduced without objection establishes (1) that, on January 30, 1979, Kraft Land Services, Inc. (“Kraft”), executed a deed conveying to R.B. alone the property described in the July 21, 2006, quitclaim deed and (2) that, on December 27, 2002, and January 2, 2003, R.B. and Emily executed deeds conveying the property that was described in the July 21, 2006, quitclaim deed to A.J. and his son subject to life estates reserved by R.B. and Emily. A.J. argues that the 1979 deed from Kraft established that R.B. acquired title solely in his name to the property that was described in the July 21, 2006, quitclaim deed and, that, therefore, Emily never owned any interest in that property. A. J. further argues that, because Emily did not own an interest in that property, she could not reserve a life estate in that property in the December 27, 2002, and January 3, 2003, deeds. Thus, according to A.J., evidence was admitted without objection that established (1) that, regardless of whether the July 21, 2006, quitclaim deed was valid, Emily never owned an intei*est in any of the property that was described in the July 21, 2006, quitclaim deed and (2) that, therefore, by virtue of the December 27, 2002, and January 2, 2003, deeds, A.J. and his son became the owners of the entire fee-simple interest in the property described in the July 21, 2006, quitclaim deed upon R.B.’s death on October 12, 2007.
The flaw in A.J.’s argument is that, although the 1979 deed executed by Kraft describes some of the property that was described in the July 21, 2006, quitclaim deed, it does not describe all the property that was described in the July 21, 2006, quitclaim deed. The July 21, 2006, quitclaim deed described two tracts of property located in Section 3, Township 5 South, Range 10 East:
“Tract 1 — The North 1/2 of the SW 1/4 of Section 3, Township 5 South, Range *727 10 East containing 80 acres, more or less.
“Tract 2 — All of that portion of the NW 1/4 of Section 3, Township 5 South, Range 10 [East], lying west of the Norfolk Southern Railroad containing 105 acres, more or less.”
On the other hand, the portion of Section 3, Township 5 South, Range 10 East described in the 1979 deed executed by Kraft is:
“The Northwest 1/2 of the East 1/2 that lies west of Brow Road and all of the North 1/2 of the Northwest 1/4 and all of the SE 1/4 of the NW 1/4 east of Alabama Great Southern Railroad right-of-way; and all of the SW 1/4 of the NW 1/4 lying northwest of Valley Head to Battelle Road; and the NW 1/4 of the SW 1/4 lying West of the Valley Head to Battelle Road;”
Thus, the property described in the July 21, 2006, quitclaim deed included the entire North 1/2 of the SW 1/4 of Section 3, Township 5 South, Range 10 East, i.e., all the NW 1/4 of the SW 1/4 and all the NE 1/4 of the SW 1/4, whereas the 1979 deed executed by Kraft included only a portion the NW 1/4 of the SW 1/4 and none of the NE 1/4 of the SW 1/4. Moreover, it appears that the July 21, 2006, quitclaim deed described portions of the NW 1/4 of Section 3, Township 5 South, Range 10 East that were not included in the 1979 deed executed by Kraft. Thus, although the 1979 deed executed by Kraft indicates that R.B. had acquired title solely in his name to some of the property that was described in the July 21, 2006, quitclaim deed, it does not indicate that he had acquired title solely in his name to all the property that is described in the July 21, 2006, quitclaim deed. Consequently, the evidence upon which A.J. relies was not sufficient to adjudicate in its entirety the claim he sought to add through his Rule 15(b) motion.
The trial that resulted in the August 12, 2010, judgment was the first of two bifurcated trials in this case; the second trial has not been conducted yet. Thus, the trial court’s denial of A.J.’s Rule 15(b) motion does not foreclose his seeking leave to amend his counterclaim to state the claim that was the subject of his Rule 15(b) motion before the second trial. Given the particular procedural posture of this case and the fact that the evidence cited by A. J. was not sufficient to adjudicate in its entirety the claim that was the subject of his Rule 15(b) motion, we decline to hold that the trial court exceeded its discretion in determining that the claim that was the subject of his Rule 15(b) motion was not tried by express or implied consent. See Ammons v. Tesker Mfg. Corp., 853 So.2d at 216 (“ We also note that a determination “as to whether [an] issue has been tried by express or implied consent under Rule 15(b) is a matter for the trial court’s sound discretion, which will not be altered on appeal absent an abuse [of that discretion].” ’ ”).
Finally, A.J. argues that the trial court erred in concluding that, because it had determined that the July 21, 2006, deeds were due to be canceled because they were the product of undue influence, the issue whether R.B. was mentally incompetent when he signed those deeds was moot. However, that ruling was not adverse to A.J. because he was not the party claiming that R.B. was mentally incompetent when he signed the July 21, 2006, deeds. “ ‘A party cannot claim error where no adverse ruling is made against him.’ ” Alcazar Shrine Temple v. Montgomery County Sheriff’s Dep’t, 868 So.2d 1093, 1094 (Ala.2003) (quoting Holloway v. Robertson, 500 So.2d 1056, 1059 (Ala.1986)). Accordingly, we dismiss A.J.’s appeal insofar as he argues that the trial court erred in ruling that the issue wheth *728 er R.B. was mentally incompetent when he signed the July 21, 2006, deeds was moot. See Alcazar Shrine Temple v. Montgomery County Sheriff’s Dep’t, 868 So.2d at 1094-95. In all other respects, we affirm the judgment of the trial court.
APPEAL DISMISSED IN PART; AFFIRMED.
THOMPSON, P.J., and PITTMAN, THOMAS, and MOORE, JJ., concur.

. This is the second time A.J. and his mother, Emily Brown, have been before this court. R.B., who was A.J.’s father and Emily’s husband, died on October 12, 2007, and Emily filed in the DeKalb Probate Court a petition to probate a will that R.B. had executed in 1957. A.J. filed a contest of the 1957 will in the DeKalb Probate Court. The will contest was later removed to the DeKalb Circuit Court. The DeKalb Circuit Court then entered a summary judgment in favor of Emily, and A.J. appealed. In Brown v. Brown, 21 So.3d 1 (Ala.Civ.App.2009), this court affirmed the summary judgment in favor of Emily.